

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-13-00646-CV

Robert Ray **PEREZ** and Rhonda Lee Arevalo,
Appellants

v.

Arturo Zepeda **ARREDONDO**, CUSA KBC, LLC d/b/a Kerrville Bus Company,
Appellees

From the 79th Judicial District Court, Brooks County, Texas
Trial Court No. 10-07-15670-CV
Honorable Joaquin Villarreal III, Judge Presiding

Opinion by:　Karen Angelini, Justice
Dissenting Opinion by:　Rebeca C. Martinez, Justice

Sitting:　　Catherine Stone, Chief Justice
　　　　　Karen Angelini, Justice
　　　　　Rebeca C. Martinez, Justice

Delivered and Filed: December 3, 2014

AFFIRMED

On June 24, 2010, Arturo Arredondo was driving a charter bus for Kerrville Bus Company

("KBC") on Highway 281 when he failed to stop the bus in time to prevent it from hitting the back

of a pick-up truck driven by Robert Perez. Twenty-one-year-old Perez and his mother, Rhonda

Arevalo, suffered personal injuries as a result of the accident. They sued Arredondo for negligence.

They also sued his employer, KBC, for gross negligence, negligent entrustment, negligent hiring,

and negligent supervision.

At trial, the jury found Arredondo and KBC negligent. It awarded Arevalo $10,000 for physical pain and mental anguish sustained in the past; $100,000 for physical pain and mental anguish that in reasonable probability will be sustained in the future; $10,000 for physical impairment sustained in the past; $50,000 for physical impairment that in reasonable probability will be sustained in the future; $94,000 for medical expenses incurred in the past; and $50,000 for medical expenses that in reasonable probability will be incurred in the future. The jury awarded Perez $5,000 for physical pain and mental anguish sustained in the past; $5,000 for physical impairment sustained in the past; and $24,000 in medical care expenses incurred in the past. The jury did not award Perez any damages for pain and mental anguish that in reasonable probability he will sustain in the future; for physical impairment that in reasonable probability he will sustain in the future; or for medical care expenses that in reasonable probability he will incur in the future. Nor did the jury award any damages relating to Perez's loss of earning capacity. The jury also found KBC grossly negligent and awarded exemplary damages in the amount of $1,000,000. However, because the trial court determined no evidence supported the jury's finding of gross negligence against KBC, it signed a judgment notwithstanding the verdict that omitted the jury's award of $1,000,000 for gross negligence. On appeal, Perez and Arevalo argue the trial court erred in signing the JNOV because (1) the trial court violated Texas Rule of Civil Procedure 301, and (2) there was legally sufficient evidence to support the jury's gross-negligence finding. Additionally, Perez argues the jury's findings of zero damages with respect to his future pain and mental anguish, future physical impairment, and past and future loss of earning capacity are so against the great weight and preponderance of the evidence that they are clearly wrong and unjust. We affirm.

**I.      Did the trial court err procedurally in signing the final judgment?**

According to Perez and Arevalo, the trial court erred procedurally when it signed the JNOV. Perez and Arevalo claim the trial court violated Texas Rule of Civil Procedure 301 by disregarding "a material finding on its own initiative and in the absence of a pending motion to disregard and without the required notice, hearing, and ruling thereof." However, in reviewing the record, we conclude that the trial court did not sign the JNOV in violation of Rule 301.

*A.  Procedural Background*

Following the jury's verdict, Perez moved for entry of final judgment and attached a proposed judgment. At a hearing on April 29, 2013, immediately after announcing, KBC and Arredondo lodged objections to the trial court signing the proposed judgment submitted by Perez. Specifically, KBC argued there was legally and factually insufficient evidence to support the proposed judgment. KBC also explained that chapter 41 of the Texas Civil Practice and Remedies Code limited the amount of exemplary damages that could be awarded. In response, Perez argued there was sufficient evidence to support a gross-negligence finding. Likewise, Arevalo argued there was sufficient evidence to support the gross-negligence finding. Arevalo then discussed how chapter 41's cap on exemplary damages applied to the case. At the end of argument, the trial court stated:

> I thought that this hearing was going to be mainly about gross negligence. I reluctantly allowed it thinking that the jury would not go with gross negligence. I could have been wrong. So I – I was planning to revisit my decision on allowing the gross – gross negligence. And that's what I'm going to do first before I – I – I accept any argument on – on the limitations. The – I think the suggestion on – on the costs, it easily could be worked around by the attorneys. I don't want to get into all the calculations of court costs. Either we leave it blank and – and let the – the clerk decide what the court costs are the way they usually do, because I've never been asked to set a figure on court costs, exact figure, other than just say who pays court costs. If you want to brief me on gross negligence, you got to do it within

seven days so I can get back to you quick, because I – I do plan to revisit my decision on gross negligence. So until I hear – you hear from me, then just don't cash the check yet.

The parties then filed briefs regarding the sufficiency of the evidence to support the jury's gross-negligence finding. At a second hearing on May 24, 2013, the trial court stated:

> The – sometimes when I – when I – I'm faced with an issue like that and I can go either way, I let the jury to see what the jury's going to do. And the jury didn't go the way I thought it was – they were – they were going to go. But frankly, in talking to the Plaintiffs, I – I don't see how the evidence that I heard will sustain gross negligence damages. But I did it this way because if I'm wrong, on your appeal, I can be reversed. If I went the other way and not submitted the question, then we'd have another trial. So, I'm trying to save money, hopefully, there. So everything that – that – every objection that you raised, Mr. Gonzalez [defense counsel], I think I'm denying except the gross negligence. I agree with you that there was not enough evidence to justify a gross negligence submission. But I think that that solves the problem as to whether you have to – to plead the – the – the gross negligence limits or not. Anything else that you need for me to make a ruling on?

Perez then argued that the jury's zero-damages findings regarding his future damages were not supported by sufficient evidence. When the trial court stated that it was ready to sign Perez's proposed judgment without the award regarding gross negligence, Perez objected, stating that every party should receive "three days notice to actually see what the actual judgment is going to look like before the judge signs it." According to Perez, he wanted his appellate lawyer to have a chance to look at the proposed judgment. The trial court agreed to allow the parties to have more time to review the proposed judgment. It was decided that KBC would prepare and submit a proposed judgment and the court would hold yet another hearing.

On June 4, 2013, KBC filed a motion to disregard certain jury findings, arguing the evidence was legally insufficient to support the jury's gross-negligence finding against it. On June 26, 2013, the trial court held another hearing and then signed the final judgment, which did not include an award for gross negligence. Perez then filed a motion for new trial, arguing that the

jury's zero-damages findings against him were so against the great weight and preponderance of the evidence as to be manifestly unjust and that the jury's gross-negligence finding was supported by sufficient evidence. Perez and Arevalo then filed notices of appeal.

### B. Texas Rule of Civil Procedure 301

Rule 301 provides that the "judgment of the court shall conform to the pleadings, the nature of the case proved and the verdict, if any, and shall be so framed as to give the party all the relief to which he may be entitled either in law or equity." TEX. R. CIV. P. 301. "Provided, that upon motion and reasonable notice the court may render judgment non obstante veredicto if a directed verdict would have been proper, and provided further that the court may, upon like motion and notice, disregard any jury finding on a question that has no support in the evidence." *Id.* Perez and Arevalo cite caselaw for the proposition that (1) a trial court may not disregard a material finding and sign a JNOV on its own motion, and (2) if a motion, notice, and hearing are not shown to be part of the record, the JNOV should be reversed. *See Lamb v. Franklin*, 976 S.W.2d 339, 343 (Tex. App.—Amarillo 1998, no pet.) (holding trial court erred in signing JNOV because the record did not reflect that a motion for JNOV was filed or that a hearing on such motion was had). However, as pointed out by KBC, the trial court did not sign a JNOV on its own motion. At the hearing on plaintiffs' motion for entry of judgment, KBC argued there was no evidence to support the judgment. Whether there was sufficient evidence to support the jury's gross-negligence finding was argued by both parties. The trial court then requested briefing on the issue. In response to the briefing, the trial court held a second hearing. When plaintiff's counsel requested additional notice, the trial court granted the request and did not sign a judgment. KBC then filed a motion for JNOV, and at the third hearing, during which time both parties were allowed to present arguments regarding the motion for JNOV, the trial court finally signed the JNOV. Therefore, in contrast to

Perez and Arevalo's argument, the trial court did not sign the JNOV on its own motion or without holding a hearing on the motion for JNOV in violation of Rule 301.

**II. Did the trial court err in signing the JNOV because there was sufficient evidence to support the jury's gross-negligence finding?**

Because the trial court determined there was no evidence to support the jury's finding of gross negligence, it signed a JNOV that did not award exemplary damages. On appeal, Perez and Arevalo argue that the trial court incorrectly concluded there was no evidence to support the jury's finding of gross negligence and thus erred in signing the JNOV. We review a JNOV under a no-evidence standard. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

For a claimant to be entitled to exemplary damages for his gross-negligence claim, he must prove "by clear and convincing evidence that the harm with respect to which [he] seeks recovery of exemplary damages results from . . . gross negligence." TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(3) (West Supp. 2014). The Texas Supreme Court has explained that when a court reviews the sufficiency of the evidence to support a "clear and convincing" standard of proof in a case, it should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Sw. Bell Tele. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004). If, after conducting its legal sufficiency review of the evidence, the court determines that no reasonable factfinder could have formed a firm belief or conviction that the matter that must be proven is true, then the court must conclude that the evidence is legally insufficient. *Id.*

Applying this standard of review to the facts of this case, we must consider whether a reasonable factfinder could have formed a firm belief or conviction that the harm to Perez and Arevalo resulted from KBC's gross negligence. If a reasonable factfinder could have formed a firm belief or conviction that KBC committed gross negligence, then the trial court erred in signing

the JNOV. If, on the other hand, a reasonable factfinder could not have formed a firm belief or conviction that KBC committed gross negligence, then the trial court did not err in signing the JNOV.

Section 41.001(11) of the Texas Civil Practice and Remedies Code defines "gross negligence" as

> an act or omission: (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (West 2008). The Texas Supreme Court has explained that gross negligence thus requires a showing of two elements:

> (1) viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed[s] in conscious indifference to the rights, safety, or welfare of others.

*Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014) (quoting *Lee Lewis Constr. Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001)) (alteration in original). The supreme court has explained that "[u]nder the first, objective element, an extreme risk is 'not a remote possibility of injury or even a high probability of harm, but rather the likelihood of serious injury to the plaintiff.'" *Id.* (quoting *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998)).

Under the second, subjective element, "'actual awareness means the defendant knew about the peril, but its acts or omissions demonstrated *that it did not care*.'" *Id.* (quoting *Mobil Oil*, 968 S.W.2d at 921) (emphasis added). In examining proof of this second, subjective element "courts *focus on the defendant's state of mind*, examining whether the defendant knew about the peril caused by his conduct but acted in a way *that demonstrates he did not care about the consequences*

*to others*." *Reeder v. Wood Cty. Energy, LLC*, 395 S.W.3d 789, 796 (Tex. 2013) (emphasis added). That is, "a party cannot be liable for gross negligence when it actually and subjectively believes that circumstances pose no risk to the injured party, even if [it is] wrong." *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 141 (Tex. 2012). Thus, we must examine the record to see whether a reasonable factfinder could have formed a firm belief or conviction that KBC knew about the peril caused by Arredondo's driving but acted in a way that demonstrated KBC *did not care about the consequences to others. See id.* at 139-41.

At trial, it was undisputed that KBC had a progressive discipline policy that was dictated by a collective bargaining agreement. Christopher Robertson, KBC's safety director, testified that KBC was bound to follow this progressive discipline policy. Under the progressive discipline policy, when a driver has a first offense, he is given counseling and/or a written warning. If the driver commits a second offense, he is given a written warning. If the driver commits a third offense, he will receive a written warning, suspension, or a discharge. If a driver commits a fourth offense, KBC has the discretion to discharge the employee. The policy states that "[a]ny written warning issued or suspension action taken against an employee will remain in effect for a period of twelve (12) months from the date of such warning or action." Robertson explained the policy was based on a "twelve month cycle," "a rolling calendar year." So, if an employee had a chargeable offense in January, his chargeable offense would clear the following January. In addition to this progressive discipline policy, any time a driver commits an offense, KBC retrains and retests the driver.

Arredondo, who was seventy-three-years-old at the time of trial, testified that he began driving eighteen-wheeler trucks when he was sixteen years-old. He testified he also drove school buses for the San Antonio Northside Independent School District and had been doing so for seven years. At the time Arredondo was first hired by KBC as a part-time driver, he already possessed a

commercial driving license. KBC's employee training records show that in late July 2007, Arredondo underwent training at KBC. On July 20, 2007, his instructor for his training made the following notes:

> DAY ONE. Parking lot training. NEED very little instruction. Did very well. Catch on fast. All you need is to tell him once. Very professional.

The next day, his instructor noted the following:

> DAY TWO. Today, we had one big problem. Arturo, need more practice on turning right and left turns.

Christopher Robertson, KBC's corporate representative who was its safety director at the time of the accident, testified that there are other documents in Arredondo's driver qualification file that would show his progression through training.

One month after Arredondo was hired, on August 8, 2007, he hit two fixed-objects: he hit a parked car and a walk/don't walk sign. Arredondo testified that he was driving the bus near a church, and a person had parked his car too close to the corner of the intersection of the street. According to Arredondo, there were cars parked on both sides of the street, and the street was very narrow. As he made the turn, he hit the back of the car parked too closely to the intersection. Similarly, according to Arredondo, he hit the walk/don't walk sign because it was placed at the edge of the curb, and the sign itself was hanging over the street. These two fixed-object accidents were charged to his KBC driving record. KBC gave him a written warning and retrained him. In July 2008, KBC terminated Arredondo. A Personnel Action Form entered in evidence shows that the last day Arredondo worked for KBC was October 26, 2007. The form noted that the termination was involuntary. Whether Arredondo was "[e]ligible for rehire" was checked "no," with the following comment: "DO NOT RE-HIRE." When asked about Arredondo's termination in 2007, Robertson testified "[h]e was terminated because he wasn't working for us at the time. He was

inactive." When asked if Arredondo's termination letter stated he was terminated because his driver's log was not current, Robertson testified he thought the letter stated Arredondo was terminated because he had not worked and because KBC had not "received the current logs." Robertson explained in his testimony that a driver has a maximum period he can drive in one day and has some mandatory time off. Thus, before KBC can hire a part-time driver, KBC must know what that driver has done in the previous seven days. According to Robertson, the termination letter informed Arredondo that KBC was "separating from him at this time" and that "[i]f he wished to come back later, then he would have to requalify to the safety department." Later, when asked whether he participated in the creation of the personnel action form, Robertson admitted that he did not and that he did not know the underlying reason for the "do not rehire" comment made on the form.

In June 2008, Arredondo started the process of requalifying to KBC's safety department. On June 27, 2008, he took a "pre-trip evaluation." Robertson testified that pre-trip evaluations are safety inspections of the bus, "to make sure all of the equipment is functioning appropriately." The instruction noted on the "pre-trip evaluation" form that out of twenty-eight different items, Arredondo failed to check "trash bag supply" and "GPS/NEXTEL." The instruction specifically noted in the comments that Arredondo's "log [was] not filled out correctly" and he was "weak on vehicle control knowledge." The instructor "recommend[ed] follow-up training and follow-up evaluation." Arredondo testified that after this recommendation, he was retrained and received remedial training on his logs. The pre-trip evaluation dated August 12, 2008, indicates that "Arturo [Arredondo] received remedial training on log completion and coach inspections. Arturo was thoroughly briefed on the three pre-trip inspection items that he did not check." That same day, Arredondo passed a road test in all areas tested. In the remarks section, the instructor specifically noted that Arredondo had "good control," an "excellent turn," "good speed," and was "very

observant of changing signals." The "post-trip evaluation" noted that Arredondo had a "good inspection and shut down." Arredondo was rehired.

The record shows that eight months later, on April 18, 2009, Arredondo erroneously drove a bus of passengers to Georgetown, Texas instead of George West, Texas. KBC gave Arredondo his first written warning since his rehire. Three months later, on July 26, 2009, Arredondo was involved "in chargeable accident with minimal damage" "while en route to Eagle Pass," Texas. Arredondo received his second written warning under KBC's progressive disciplinary policy and was retrained. The Certification and Training Cover Sheet reflected that Arredondo was evaluated on August 20, 2009. He scored 100% in pedestrian safety, intersection safety, backing basics, passing and lane changing, space management, trip inspection, and being a professional driver. He was given 99% on his pre-trip evaluation; 98% on his driving evaluation; and 100% on his post-trip evaluation. Although he scored 98% on his driving evaluation, the instructor noted that Arredondo "touched [a] curb."

Almost eight months later, on April 11, 2010, Arredondo hit a fixed-object, an awning at the Uvalde bus terminal. He was again retrained. Then, on June 24, 2010, Arredondo was involved in the underlying accident.

In support of their argument that there is evidence from which a reasonable factfinder could have formed a firm belief or conviction that KBC knew about the peril caused by Arredondo's driving but acted in a way that demonstrated KBC *did not care about the consequences to others*, Perez and Arevalo argue the evidence shows the following:

(1) Arredondo had the worst record of all KBC's drivers.

(2) Robertson testified he would give himself a grade of D or F on safety in this situation.

(3) KBC fired Arredondo in 2008 after two chargeable incidents with fixed objects, and the personnel action form contained the comment "DO NOT REHIRE."

(4) KBC then rehired Arredondo and continued to employ him over the next three years even though he had three more chargeable offenses.

(5) Arredondo had multiple driving log infractions.

(6) Arredondo drove a bus full of passengers to the wrong city.

According to Perez, the above shows a "systemic pattern of poor driving by Arredondo that [KBC] chose to disregard."

First, the record does not reflect that Arredondo had the worst record of all KBC's drivers. In support of this claim, Perez and Arevalo point to Robertson's testimony. The record reflects that Robertson was asked at trial whether he was "aware of any other drivers for [KBC] with as poor a safety record– the safety record, are you aware of any other drivers [who] have that poor of a record?" Robertson replied, "I don't know at this time." Thus, Robertson did not, in fact, testify that Arredondo had the worst record. With respect to the D or F grade, Robertson was asked to "grade" himself "on the safety supervision of Mr. Arredondo." When asked if "[t]his is an area that you're an F, isn't it," Robertson replied, "I would say with what you're presenting here, yes, it definitely looks bad." Robertson's opinion that "it definitely looks bad" is not evidence that KBC knew about the peril caused by Arredondo's driving but acted in a way that demonstrated it *did not care about the consequences to others*. Further, at oral argument, Perez claimed the personnel action form in the record that includes the comment "do not rehire" also contained a comment that Arredondo was "weak on vehicle control knowledge." Perez thus claimed the "do not rehire" comment and Arredondo's driving failures were linked on the personnel action form. However, the record reflects that the comment "weak on vehicle control knowledge" is not included on the personnel action form. There is no reason given for the "do not rehire" comment. Instead, the "weak on vehicle knowledge" is found on a "pre-trip evaluation" form dated June 27, 2008, which

was more than five months after the personnel action form was created. Thus, the personnel action form does not reflect that the "do not rehire" comment is related to Arredondo's driving.

The evidence does reflect that before his termination in 2008 Arredondo had two "chargeable" incidents with fixed-objects. However, the evidence also shows that KBC retrained Arredondo each time, and Arredondo passed his retraining. The record also reflects that before Arredondo was rehired, he had to undergo a recertification process, which he passed. Arredondo then erroneously drove passengers to the wrong city. He had driver's log infractions. He was involved "in chargeable accident with minimal damage" "while en route to Eagle Pass" and later hit a fixed object, an awning at the bus terminal. However, after each of these chargeable incidents, he was given written warnings pursuant to the progressive disciplinary policy. As this progressive disciplinary policy was part of a collective bargaining agreement, KBC was obligated to follow it. Further, after each chargeable incident, KBC retrained Arredondo. We cannot conclude that these are actions of a company that *does not care about the consequences to others.*

Courts that have found sufficient evidence to support a gross-negligence finding have been presented with more egregious facts than those presented here. For example, in *Ryan Services, Inc. v. Bobbins*, No. 13-99-00299-CV, 2001 WL 1002189, at *1 (Tex. App.—Corpus Christi 2001, pet. denied), a company's employee was the driver of a truck who ran a red light and hit the plaintiff's vehicle. The jury assigned 99% of the fault of the accident to the employee truck driver. *Id.* It also found the company liable for negligent entrustment with malice and awarded punitive damages in the amount of $500,000. *Id.* At trial, there was evidence that the employee driver had been employed from 1982 to 1989 when he was fired for insubordination. *Id.* He was then rehired in 1991 or 1992, and continued as a driver for the company until his death in 1997. *Id.* In his employment application, the employee stated he had had no conviction for traffic violations for the prior three years and had not been involved in an accident for five years. *Id.* According to the

company's vice-president, before rehiring the employee, he obtained a moving vehicle report that, contrary to the information provided by the employee, showed the employee had been convicted for driving while intoxicated during the previous five years, had been involved in at least one alcohol-related accident, and had received several other citations for moving and over-weight violations. *Id.* The vice-president testified that he hired the employee despite having learned this information. *Id.* Three days before the accident at issue in the case, the vice-president ran another moving vehicle report on the employee in connection with an annual driving record review required by the United States Department of Transportation. *Id.* According to the vice-president, when he signed the form certifying that he had reviewed the employee's driving record and that the employee met the minimum requirements for safe driving, the vice-president was aware the employee's license had been suspended for a three-month period from June 1996 to September 1996. *Id.* The vice-president knew that during this time the employee's license was suspended, the employee had continued to drive without interruption for the company. *Id.* In reviewing the evidence, the Corpus Christi Court of Appeals concluded that there was evidence to support the finding that the company knew about the extreme degree of risk posed by the employee, but acted or failed to act in a manner demonstrating that it did not care about the consequences to others. *Id.* at *5-6. The court of appeals pointed to the vice-president's testimony that he knew the employee had lied on his application about his conviction for DWI, his involvement in at least one alcohol-related accident, and other traffic violations, but rehired the employee anyway. *Id.* at *6. The court of appeals also pointed to the vice-president's testimony that he certified the employee as a safe driver even though he knew the employee had been driving for the company while his license was suspended. *Id.* The court concluded that this was sufficient evidence to show that the company knew about the danger posed but simply did not care. *See id.*

Similarly, in *Montemayor v. Heartland Transportation, Inc.*, No. B-07-CV-151, 2008 WL 4777004, at \*1 (S.D. Tex. 2008), the court found some evidence existed to support the plaintiff's claim of gross negligence against a trucking company. The summary judgment evidence showed that a tractor-trailer driven by the trucking company's employee collided with a parked tractor-trailer at a truck stop and injured the driver sleeping inside. *Id.* There was evidence presented that before the trucking company's employee began working for the trucking company, he had been involved in one "wreck" and had received at least thirteen traffic violations. *Id.* From November 2005 to May 3, 2006, during his employment with the trucking company, he was involved in "three more wrecks." *Id.* The company's safety director decided to fire the employee. *Id.* However, instead of firing the employee immediately, the safety director ordered the dispatcher to have the employee get an additional load, deliver it, and return to headquarters. *Id.* Before the employee could return to headquarters, he collided with the plaintiff's truck. *Id.* In looking at this summary judgment evidence, the trial court determined that a fact issue existed with respect to the company's gross negligence because there was evidence that the company not only knew about the employee's "negative driving history" and "decided to fire him as a result of it, but nonetheless retained him for one more assignment." *Id.* The court concluded that the plaintiff had met its summary judgment burden in showing that although the trucking company knew about the extreme degree of risk, it simply did not care. *See id.*

In contrast, the evidence presented in this case does not present facts as egregious as those discussed above. The evidence in this case does not rise to a level from which a reasonable factfinder could have formed a firm belief or conviction that KBC knew about the peril caused by Arredondo's driving but acted in a way that demonstrated KBC *did not care about the consequences to others. See U-Haul*, 380 S.W.3d at 139-41. As noted, the undisputed evidence shows that KBC tested Arredondo's driving skills when it hired him. After every chargeable

incident, it gave him written warnings pursuant to the collectively bargained progressive discipline policy, and it retrained him.

Finally, we note that Perez and Arevalo cite numerous cases in support of their argument that there was sufficient evidence to support the jury's gross-negligence finding in this case, *see e.g., Lorillard v. Davis*, 770 S.W.2d 606 (Tex. App.—Dallas 1989, writ dism'd w.o.j.). However, these cases pre-date the applicable two-prong test for gross negligence enunciated by the Texas Supreme Court in *Transportation Insurance Co. v. Moriel*, 879 S.W.2d 10, 19-21 (Tex. 1994). Thus, the cases relied on by Perez and Arevalo are not persuasive.

We therefore conclude that there is legally insufficient evidence to support the jury's gross-negligence finding. And, because there was legally insufficient evidence of gross negligence, the trial court did not err in signing a JNOV that omitted the gross-negligence damages.

### III. Is Robert Perez entitled to a new trial because the jury's findings of zero damages are so against the great weight and preponderance of the evidence that they are clearly wrong and unjust?

Perez argues that the jury's findings of zero damages with regard to future pain and mental anguish, future physical impairment, and past and future loss of earning capacity are so against the great weight and preponderance of the evidence that they are clearly wrong and unjust.[1] In its verdict, the jury awarded Robert Perez $5,000 for his past physical pain and mental anguish; $5,000 for physical impairment sustained in the past; and $24,000 for past medical expenses. However, it did not award him any damages relating to his claims of future physical pain, future physical impairment, future medical expense, and past and future loss of earning capacity. Thus, it appears the jury believed Perez was injured as a result of the accident, but that he was better at the time of trial.

---

[1] In his brief, Perez makes no argument with regard to the jury's zero-damages finding with regard to future medical expenses.

As the party challenging the factual sufficiency of jury findings upon which he had the burden of proof at trial, Perez must demonstrate that the adverse findings are "so against the great weight and preponderance of the evidence that [they are] clearly wrong and unjust." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). In our review, we consider and weigh all the evidence. *Id.*

### A.  Future Pain and Mental Anguish

"Mental anguish is defined as 'intense pain of body or mind . . . or a high degree of mental suffering.'" *Hicks v. Ricardo*, 834 S.W.2d 587, 592 (Tex. App.—Houston [1st Dist.] 1992, no writ) (quoting *Cactus Drilling Co. v. McGinty*, 580 S.W.2d 609, 611 (Tex. Civ. App.—Amarillo 1979, no writ)). "Mental anguish is something more than mere worry, anxiety, vexation, or anger." *Id.* Mental suffering may be implied from injuries accompanied by physical pain. *Id.* "Damages for future mental anguish are recoverable only if there is a reasonable probability that they will be suffered in the future." *Id.* Similarly, damages for future physical pain are recoverable only if there is a reasonable probability the injury will continue to affect the plaintiff into the future. *See id.*

Robert Perez argues the uncontroverted evidence shows that there is a reasonable probability the injury will continue to affect him and cause him pain. He points to the testimony of his testifying expert, Dr. Williams:

> Q:  Do you have an opinion as to whether the annular tear is going to continue to cause pain and problems for Robert in the future?
> A:  Well, none of us have a crystal ball, but based on where he is up to now I would expect that he would continue to have about the same amount of symptoms and pain.
> Q:  And for how long would that continue?
> A:  Indefinitely, for the rest of his life.
> Q:  And why would that be?
> A:  Well, because the annular tears generally don't heal. Over time he may suffer early degeneration of the disc. He can have additional problems.

Perez emphasizes in his brief that Dr. Williams testified Perez met the definition of chronic injury:

> Q: [W]hat is the medical definition of a chronic injury?
> A: Generally people consider an injury that goes on more than three to six months to be chronic.
> Q: Based on that definition, did Robert's symptoms meet the definition of a chronic injury?
> A: Yes, they do.
> Q: And because of that, do you expect that Robert's injuries will continue in the future?
> A: Because of his results of treatment today I expect that it would continue to be about the same that it has been up to now.

In support of his argument that the jury's findings of zero damages are so against the great weight and preponderance of the evidence that they are clearly wrong and unjust, Perez relies on *Schaffer v. Nationwide Mutual Insurance Co.*, No. 13-11-00503-CV, 2013 WL 2146833, at *2 (Tex. App.—Corpus Christi 2013, pet. denied). The court of appeals in *Schaffer* reversed a zero-damages finding of no past pain because "there was simply no evidence that supported the jury's finding that Schaffer suffered zero past pain." *Id.* at *8. "And the evidence that Schaffer suffered some pain was neither scant nor conflicting." *Id.* "Schaffer's past physical pain was a fact that was established by her evidence and conceded by the medical witnesses called by Nationwide." *Id.* Thus, the court concluded "the jury's finding that Schaffer was entitled to zero damages for past physical pain was so against the great weight and preponderance of the evidence as to be manifestly unjust." *Id.*

KBC argues this case is not like *Schaffer*, because in this case, the evidence is not uncontroverted. The record shows that following the accident in June 2010, Perez told the investigating officer at the scene he was not injured. Five days later, he visited an internist, Dr. Michael Pendleton, complaining of pain in his back and shoulder. An MRI showed evidence of an

annular tear. Dr. Pendleton referred him to another doctor for epidural injections to help his pain. Dr. Pendleton, Perez's treating physician, testified that Perez's "symptoms improved." "He actually improved with the treatment. He needed less medication. His functional status improved. I saw his demeanor improving. He felt better." Perez saw Dr. Pendleton approximately twenty times following the accident. Dr. Pendleton did not recommend any surgical intervention for Perez because Perez improved with epidural steroids. Perez's last visit was in January 2012, fifteen months before trial. Perez was told to return to the clinic as needed. Dr. Pendleton testified Perez had not visited the clinic for the past year and four months. Perez himself confirmed that the last time he saw Dr. Pendleton was a year and four months before trial and that he had not felt the need to return. Dr. Williams admitted that the tear Perez suffered could heal by filling "in with scar tissue."

Last year, the Dallas Court of Appeals in *Lanier v. Eastern Foundations, Inc.*, 401 S.W.3d 445, 455 (Tex. App.—Dallas 2013, no pet.), noted that the "jury generally has great discretion in considering evidence on the issue of damages." "Matters of pain and suffering, mental anguish, physical impairment, and loss of consortium are necessarily speculative, and it is particularly within the jury's province to resolve these matters and determine the amounts attributable thereto." *Id.* "When uncontroverted, objective evidence of an injury is presented and the causation of the injury has been established, courts are more likely to overturn jury findings of no damages for *past physical pain and impairment*." *Id.* (emphasis added). "On the other hand, if the indicia of injury are more subjective than objective in nature, appellate courts are generally more reluctant to hold a jury finding of no damages contrary to the great weight and preponderance of the evidence." *Id.* "Finally, uncontroverted, objective evidence of injury does not always require mental anguish damages." *Id.* "When there is conflicting evidence about the severity of the injuries or about

whether the injuries were caused by the collision, the jury has the discretion to resolve the conflicts, determine which version of the evidence to accept, and refuse to award damages." *Id.*

Here, the jury awarded Perez for his damages in the past, but refused to award damages for future pain and mental anguish. The jury clearly felt that Perez's injury had improved and that he was better. During oral argument, Perez pointed to evidence that he saw a pain management doctor as late as February 2013 complaining of pain. However, given that there was evidence of Perez's improvement, and given that the factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony, *see City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005), we cannot conclude that the jury's finding of zero damages with regard to Perez's future pain and mental anguish is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242.

### B.    *Future Physical Impairment*

The "effect of any physical impairment must be substantial and extend beyond pain, suffering, mental anguish, lost wages or diminished earning capacity." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003).

In support of his argument that the jury's finding of zero damages with regard to future physical impairment is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust, Perez again points to Dr. William's testimony that in all reasonable probability Perez would be physically impaired into the future, likely for the rest of his life; that annular tears generally do not heal; that Perez may suffer early degeneration of the disc; that Perez met the definition of a chronic injury; and that Dr. Williams expected that Perez's injuries would remain the same as they had up to the time of trial. Perez argues that this evidence was not controverted by any defense witness. In response, KBC points out that Perez relies heavily on the testimony of his testifying expert, Dr. Williams, while his treating physician, Dr. Pendleton,

testified Perez's symptoms had improved. KBC argues the "jury may reasonably have given more weight to the opinion of Perez's treating physician over an expert who saw Perez once." We agree with KBC and cannot conclude that the jury's finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242.

### C. Past and Future Loss of Earning Capacity

Finally, Perez complains that the jury's findings of zero damages with respect to past and future loss of earning capacity are so against the great weight and preponderance of the evidence that they are clearly wrong and unjust.

Loss of past earning capacity is the plaintiff's diminished capacity to earn a living during the period between the injury and the date of the trial. *Bituminous Cas. Corp. v. Cleveland*, 223 S.W.3d 485, 491 (Tex. App.—Amarillo 2006, no pet.). The key focus of the analysis is (1) what the plaintiff's capacity to earn was, and (2) how that capacity was impaired by the injury. *Id.* By contrast, an award for future loss of earning capacity can be based on a combination of factors that may affect a person's capacity to earn a living. *Metro. Life Ins. Co. v. Haney*, 987 S.W.2d 236, 244 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). A plaintiff's future earning can be shown by evidence of the following: (1) past earnings; (2) the plaintiff's stamina, efficiency, and ability to work with pain; (3) the weakness and degenerative changes that will naturally result from the plaintiff's injury; and (4) the plaintiff's work life expectancy. *See Gilbreath v. Hathaway*, 108 S.W.3d 365, 367 (Tex. App.—Beaumont 2003, pet. denied); *Koko Motel, Inc. v. Mayo*, 91 S.W.3d 41, 52 (Tex. App.—Amarillo 2002, pet. denied).

Perez argues Dr. Williams's uncontroverted testimony shows how Perez's injuries would affect his ability to earn a living in a manual labor setting. He points to Dr. Williams's testimony that Perez's annular tear would bother him more when he attempted to lift something heavy and

that the annular tear would limit Perez's ability to find employment in manual labor jobs. Perez also points to evidence that he had missed opportunities, both in the past and in the future, to work in oil-field jobs. He points to the testimony of his stepfather, Gilbert Arevalo, a general foreman for Tennessee Pipeline. Gilbert Arevalo testified that his plans to hire Perez had been delayed, and that it was not until a year after the accident that he thought Perez had healed sufficiently to attempt working for Tennessee Pipeline. According to Gilbert Arevalo, after several weeks of Perez working for Tennessee Pipeline, he could see that Perez could not do the job and that he "was hurting." Thus, he fired Perez for both Perez's safety and for the safety of the other workers.

In response, KBC points out the uncontroverted evidence showing that Perez was voluntarily unemployed at the time of the accident. The record reflects that other than working for his stepfather at Tennessee Pipeline for a month and a half, Perez was still unemployed at trial. Perez testified that he graduated from high school in 2008, but did not go to college or pursue any type of professional training. In the three years between high school and the accident, Perez worked odd jobs. Although Perez testified that before the accident, he had "planned" to work with his stepfather at Tennessee Pipeline, he had not taken any active steps to do so before the accident. After the accident, Perez worked at Tennessee Pipeline for a month and a half. He then worked "around the ranch" – although Perez testified he "wouldn't call it work." "I would just call it helping around."

In looking at the evidence, the jury could have reasonably concluded that Perez was voluntarily unemployed before the accident; that his injuries at the time of trial had healed; and that he was voluntarily unemployed after the accident. We thus cannot say that the jury's findings of zero damages with respect to past and future loss of earning capacity was so against the great weight and preponderance of the evidence that they are clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242.

## CONCLUSION

Because we conclude the trial court did not err in signing the JNOV that omitted exemplary damages and because the jury's findings of zero damages with respect to Perez were not so against the great weight and preponderance of the evidence that they are clearly wrong and unjust, we affirm the judgment of the trial court.


Karen Angelini, Justice