

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00044-CV

_____


ROBERT CAMERON MCCALL, Appellant

V.

BOBBY RAY HESTER, Appellee


On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 11-0387


Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

Robert Cameron McCall and his father, Franklin, purchased a hay cutter from Bobby Ray Hester. While Franklin and Hester were loading the hay cutter onto a flatbed truck, the hay cutter shifted, hit Robert, and injured his leg. Robert sued Hester, alleging that Hester's negligence proximately caused his injuries, and Hester designated Franklin as a responsible third party.

After hearing the parties' evidence, a jury apportioned 0% of the fault to Robert, 60% to Franklin and 40% to Hester. It awarded Robert $25,000.00 for past medical expenses, $2,500.00 for past pain and mental anguish, $2,500.00 for past impairment, and zero dollars for future damages. After reducing the total damages by 60%, the trial court entered final judgment in the amount of $13,953.00 for Robert against Hester.

Robert filed this appeal, alleging that the jury's comparative negligence and damages findings are against the great weight and preponderance of the evidence, clearly wrong, and manifestly unjust. Because we find that the jury's verdict was supported by factually sufficient evidence, we affirm the trial court's judgment.

## I. Standard of Review

When reviewing a factual sufficiency challenge, we consider, weigh, and examine all of the evidence in the record, both supporting and opposing the finding, to decide whether the verdict should be set aside. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Martin v. Martin*, 363 S.W.3d 221, 236 (Tex. App.—Texarkana 2012, pet. granted, judgm't vacated w.r.m.). "We

set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Francis*, 46 S.W.3d at 242; *see Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Martin*, 363 S.W.3d at 236. "When evaluating the sufficiency of the evidence, we measure the sufficiency of the evidence by the court's charge." *Martin*, 363 S.W.3d at 236. Because the jury remains the sole judge of witness credibility and the weight to be given testimony, we will not substitute our judgment for that of the jury during this analysis. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *see Pilgrim's Pride Corp. v. Cernat*, 205 S.W.3d 110, 119 (Tex. App.—Texarkana 2006, pet. denied).

## II. The Jury Findings Were Supported by Factually Sufficient Evidence

### A. Comparative Responsibility Finding

Robert first argues that the jury's comparative responsibility finding is against the great weight and preponderance of the evidence. We disagree.

#### 1. Applicable Facts

Franklin and Robert saw Hester's Craig's List advertisement for a hay cutter. They travelled to Hester's farm to examine and possibly buy the equipment. After agreeing on a price, they purchased the hay cutter. Franklin then realized that transporting the large, uniquely-shaped piece of equipment would be difficult. Franklin noticed that Hester had a tractor equipped with a hydraulic loader and hay fork attachments, and he asked Hester to load the hay cutter onto his flatbed truck with the tractor. Hester agreed.

Franklin, who had never transported a hay cutter, suggested that Hester place the hay forks underneath the hay cutter and secure it to the forks with a chain. According to Franklin, Hester refused, saying, "[N]o, it will fold up." Instead, Hester loaded it by attaching one end of a chain to the hay cutter and looping the other end of the chain around the back brace of the hay forks. Hester's method allowed the hay cutter to swing freely on the end of the chain. Hester told Franklin that this method was taught to him by Fish & Still, the John Deere dealership that sold him the hay cutter. Hester had successfully moved the hay cutter multiple times using this one-chain method.

When Hester lifted the hay cutter from the ground, it "began to swing in a circle and was going up and down." In spite of the swaying machine and muddy conditions, Hester maneuvered the hay cutter around his barn. When he was "probably a tractor length or so away from the truck," Franklin became uneasy with the way the hay cutter was moving about.

Franklin asked Hester to stop and place the hay cutter back on the ground. Franklin wanted to attach a second chain from the tractor loader to the hay cutter to prevent further swaying. Hester agreed. With Hester still seated in the cab of the tractor, Franklin attached the second chain approximately one and one-half feet from Hester's chain. When Hester subsequently lifted the hay cutter onto the truck, Hester's chain came loose, the hay cutter struck Robert, and Robert was knocked to the ground.

According to Hester, the addition of the second chain created slack in his chain, causing it to slip. Hester believed that the accident would not have happened if Franklin had simply allowed Hester to continue the move using the one-chain method. Franklin admitted that

4

Hester's chain appeared to be attached at the time he decided to add another chain, and other testimony demonstrated that there were no defects in Hester's chain.

At trial, Douglas Michael Jones, an employee of Fish & Still, testified that he had loaded hay cutters using the one-chain method hundreds of times without incident. He further testified that Hester was properly transporting the hay cutter. Jones added that loading a hay cutter with two chains was "a bad mistake" and that lifting a hay cutter with hay forks would also be unsafe.

Robert's accident investigation expert, Gary Lynn Jackson, testified that the hay cutter was not properly rigged. Jackson explained, "If you allow some slack to come in to the chain the hook can come loose." According to Jackson, the accident might have also happened because Hester had not used a chain designed for lifting. Jackson testified that the safest way to load the cutter would have been to use the hay forks with the hydraulic lift tractor loader. Jackson did not test either the one-chain or Franklin's two-chain approach.

Jackson agreed that Hester was loading the hay cutter in the manner that he had been taught by Fish & Still, and he admitted that Fish & Still had moved hay cutters using the one-chain method many times without incident. Although the peg on the hay cutter is "nothing like a lifting eye," Jackson agreed that Hester had attached one chain behind the peg "because it is near to the center of gravity." Jackson admitted, "If you are going to lift a piece of equipment you want to try to lift it near the center of gravity." During cross-examination, Jackson stated that if he were to use the one-chain method, he would place the chain where Hester did. Even Robert testified that when Franklin decided to add another chain he "took over half of the responsibility."

5

## 2. Analysis

Robert argues that the evidence is factually insufficient to show that Franklin was more responsible for the accident than Hester. Robert asserts several facts to support his factual sufficiency point, namely, that (1) the accident happened on Hester's property, (2) Hester undertook responsibility for safely moving the hay cutter, and (3) Jackson testified that the safest way to move the hay cutter would have been to use the hay forks to lift the machine. Nevertheless, the jury heard other facts supporting the verdict, including: (1) Robert's admission that Franklin "took over half of the responsibility," (2) Jackson's expert testimony that if he had to the use the one-chain method, he would place the chain—as Hester did—at the hay cutter's center of gravity, (3) testimony from more than one witness that Hester was using the method taught to him by Fish & Still and that the one-chain method had worked many times before without incident, (4) Jackson's statement that the one-chain method would work as long as there was no slack in the chain, (5) that the hay cutter was moved a considerable distance using the one-chain method before Franklin became uneasy, (6) that the one-chain method was working until Franklin's involvement, and (7) Jones' testimony that using two chains was a bad mistake.

It is the jury's role to resolve conflicts in the evidence and to decide what weight, if any, to give the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819–20 (Tex. 2005). From the evidence presented at trial, we find that a reasonable jury could have determined that the addition of Franklin's chain caused slack in Hester's chain and, thus, that Franklin was more responsible for the accident than Hester. Therefore, we cannot say that the jury's comparative

responsibility finding was so against the great weight and preponderance of the evidence that it is clearly wrong and unjust.

## B.     The Jury's Findings on Damages

Robert next complains that the jury's damages findings are contrary to the great weight and preponderance of the evidence and are clearly wrong and unjust. We disagree.

### 1.     Applicable Facts

Robert was treated for a head wound and a knee injury at the emergency room. He underwent an MRI of his knee, yielding the following report: "Two views of the left knee demonstrate no fracture or dislocation. Bones and joints appear normal. The soft tissues appear normal." As a result of the positive MRI report, Robert was given a pair of crutches and was sent home.

Because he continued having problems with his knee, Robert made an appointment with a second physician, who, according to Robert, "did not think the injury was serious enough" and called it a "common skier's injury." A few weeks later, Robert went to see a third doctor, Dr. Richard Buch, a board-certified orthopedic surgeon.

Buch testified that he ordered another MRI of Robert's knee, which was still swollen on March 5, 2010. According to Buch's reading of the MRI, Robert's injury was "not [so] damaging," but there was "contusion of [Robert's] bone." Characterizing the injury as a stress fracture, Buch explained, "[I]t's like you . . . [were hit] with a baseball bat in the bone and you almost fracture the inside where it's . . . swollen." Buch treated Robert with anti-inflammatory medication, advised an icing regimen, and instructed him to stay off of the knee to let it heal.

7

According to Buch, a second MRI revealed that Robert "was starting to heal inside the bone" and "got somewhat better in terms of his swelling." However, because Robert was continuing to experience pain, Buch decided to conduct arthroscopic surgery to determine whether Robert's knee cartilage had been affected by the injury.

Robert's September 24, 2010, surgery revealed that he had what Buch referred to as a "plica, which is a rudimentary problem" caused by a band of scar tissue left from development. In spite of the damage to the undersurface of Robert's kneecap, Buch testified, "In looking at the area where the contusion of the bone was on the outside of this knee, we were happy that he didn't have any big defect or anything there. It looked pretty good at that point in time." Buch released the scar tissue, scraped the cartilage, and decided to let the knee heal on its own. He testified that patients can be pretty sore after the surgery for a few weeks, but that because "[Robert] got better quickly[,] . . . [he] let him [go] back to normal activities to see how he did."

Approximately two months later, Robert returned to Dr. Buch complaining of pain. According to Buch, on November 19, 2010, Robert "was doing some strenuous exercises, some backpacking or something, and his knee started to bother him again." Buch's November 19, 2010, dictation stated, "Robert comes back in. He overdid it here in climbing up stairs and hills with a backpack. . . . If he is not better in four weeks, we might have to consider a stem cell injection." Buch then restricted Robert from work and normal activity and began administering stem cell injections into his knee.

Robert's condition improved over the next few months. Buch further testified that Robert "was already a little bit improved from the first injection," which was administered on

8

January 10, 2011. Buch called the stem cell injection "the magic elixir" and testified that Robert did "very, very well" after a second injection on February 21, 2011, and that he had a "maintenance dose" in December 2011. Robert also testified that he had another "maintenance dose" in December 2012, and his medical records indicate that he had another injection on August 14, 2013. Buch testified, "He's not swelling anymore. He's able to do more. He's functional. He still has occasional soreness here and there[,] . . . but he's still markedly improved." Buch also stated that Robert was not having as much pain, had better motion, and was able to work.

With respect to future medical expenses, Buch could not state whether Robert would need additional stem cell injections. He testified, "[I]f he stays like this and does fine[,] . . . he doesn't need any other treatment." However, Buch was worried that "sometime in the future, within the next 10 or 15 years[, Robert would] develop some real arthritis in his knee" which could require additional surgery or treatment. If Robert developed arthritis in his knee in the future, Buch testified that he would first try to treat him with more stem cell injections. If the injections did not help, Buch stated that Robert might require a knee replacement, which could cost anywhere between $50,000.00 and $105,000.00.

By the time of trial on February 25, 2014, Robert had returned to college and was back to work. At trial, Robert testified that he was still not able to get around like he used to and was unable to powerlift, play sports, bale hay, or engage in other activities that he previously enjoyed. Robert stated that he was in pain at the time of trial, that he had trouble taking the stairs that morning, and that on a scale of one to ten, his knee pain rated between three and five. He

testified that his medical expenses were $45,880.36 and that if he continued to have stem cell injections in the future, he could have future medical bills in the amount of $35,000.00.

After hearing this testimony and examining the medical records that were admitted for their perusal, the jury awarded Robert $25,000.00 for medical expenses in the past, $2,500.00 for physical pain and mental anguish in the past, $2,500.00 for physical impairment in the past, and nothing for future medical expenses, future physical pain and mental anguish, or future physical impairment. In his remaining points of error, Robert challenges the jury's damage award findings.

### 2. Analysis

#### a. Medical expenses in the past

The jury awarded Robert $25,000.00 for past medical bills. The basis of Robert's challenge to this figure is the fact that Robert and Hester entered into the following pretrial stipulation:

> Plaintiff and Defendant stipulate that the reasonable and necessary and [sic] medical and health care expenses actually paid or incurred by or on behalf of Plaintiff as a result of the occurrence totaled $45,880.36. However, Defendant does not stipulate that these medical expenses were proximately caused by the occurrence in question.

During opening statement, Hester informed the jury of the stipulation and added, "We are not here to argue that those are not reasonable and necessary. If you get to that figure about medical I will tell you to give him that past medical, absolutely. I am going to tell you to do that."

"A jury may not . . . arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial." *First State Bank v. Keilman*, 851 S.W.2d 914, 930 (Tex. App.—

10

Austin 1993, writ denied).  "'In other words, a jury may not 'pull figures out of a hat'; a rational basis for calculation must exist.'"  *Id.* (quoting *Neiman–Marcus Grp., Inc. v. Dworkin*, 919 F.2d 368, 372 (5th Cir. 1990)).  However, the "jury generally has great discretion in considering evidence on the issue of damages."  *Lanier v. E. Founds., Inc.*, 401 S.W.3d 445, 455 (Tex. App.—Dallas 2013, no pet.).  We will not disregard the jury's damages finding merely because "the jury's reasoning in arriving at its figures may be unclear."  *Keilman*, 851 S.W.2d at 930. Here, although unclear, there are several reasons why the jury might not have awarded the full amount of past medical bills as discussed in the stipulation.[1]

First, "[a] jury may conclude, even when an objective injury is shown, that the injury is attributable to factors other than a defendant's negligence."  *Nguyen v. Lijun Zhang*, No. 01-12-01162-CV, 2014 WL 4112927, at *6 (Tex. App.—Houston [1st Dist.] Aug. 21, 2014, no pet.) (mem. op.)).  Buch testified that he allowed Robert to return to normal activity after the September 24, 2010, surgery, but that Robert "was doing some strenuous exercises, some backpacking or something, and his knee started to bother him again."  Buch's November 19, 2010, dictation stated, "Robert comes back in.  He overdid it in climbing up stairs and hills with a backpack.  He is putting a lot of strain on his knee and it is maltracking with the patella.  The changes that he has are going to cause trouble."

---

[1]A stipulation of fact is "binding upon the parties, the trial court, and the reviewing court."  *M.J.R.'s Fare of Dallas, Inc. v. Permit & License Appeal Bd. of Dallas*, 823 S.W.2d 327, 330 (Tex. App.—Dallas 1991, writ denied).  Thus, the parties, the court below, and this Court are bound by this stipulation as to reasonableness and necessity. Nevertheless, the stipulation itself reserves the issue of proximate causation.  Because we find the jury could have determined that not all of the past medical expenses were proximately caused by the accident in question, the parties' stipulation is not outcome determinative.

11

"'[P]roof of a causal nexus between the event sued upon and the damages claimed is required.'" *Id.* (quoting *Jackson v. Gutierrez*, 77 S.W.3d 898, 902 (Tex. App.—Houston [14th Dist.] 2002, no pet.)). Based on this evidence, the jury could have determined that Robert failed to follow the recommended restriction to normal activity by engaging in "strenuous" activity, "overdid it," and reactivated the injury. Thus, the jury could have determined that medical bills incurred by Robert after he had re-aggravated his injury by participating in strenuous activity were not attributable to Hester's negligence. Moreover, the jury's award of $25,000.00 was not arbitrary; they were given a chart showing that as of November 19, 2010, Robert's medical expenses were less than $25,000.00. *See, e.g.*, *Houge v. Kroger Store No. 107*, 875 S.W.2d 477, 481–82 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (jury's award of past medical damages in amount less than actual medical expenses incurred was supported by factually sufficient evidence because reasonable jury could believe plaintiff's injuries were not fully attributable to accident in defendant's store).[2]

Also, despite the stipulation, the jury could have decided that Robert had healed at several points during his treatment. Buch testified that the stem cell injections were a "magic elixir" and that Robert was much improved after his first injection on January 10, 2011. As of January 10, 2011, Robert's medical expenses were roughly $27,700.00. Accordingly, evidence was before the jury on which it could find that not all of Robert's past medical expenses were caused by the accident. Because it was within the jury's province to resolve this conflict, we

---

[2]Moreover, "'[e]ven when there is uncontroverted evidence of an injury, a jury may properly deny an award of any damages when the injuries sustained are subjective, such as . . . soft-tissue injuries.'" *Nguyen*, 2014 WL 4112927, at *9 (quoting *Gutierrez v. Martinez*, No. 01-07-00363-CV, 2008 WL 5392023, at *6 (Tex. App.—Houston [1st Dist.] Dec. 19, 2008, no pet.) (mem. op.)).

12

find the evidence factually sufficient to support the jury's award of $25,000.00 for past medical expenses.

### b.    Medical expenses in the future

"Texas follows the 'reasonable probability' rule for future damages from personal injuries." *Cernat*, 205 S.W.3d at 121 (citing *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied); *Hughett v. Dwyre*, 624 S.W.2d 401, 405 (Tex. App.—Amarillo 1981, writ ref'd n.r.e.)). "Thus, in order to recover future medical expenses, a plaintiff is required to show there is a reasonable probability that medical expenses resulting from the injury will be incurred in the future and then show the reasonable costs of such care." *Id.* (citing *Machala*, 995 S.W.2d at 828). "It is within the jury's sound discretion to determine what amount, if any, to award in future medical expenses." *Id.* "Because no precise evidence is required, the jury may award such damages based on the nature of the injury, the medical care rendered before trial, and the condition of the injured party at the time of trial." *Id.*

The jury, which was present in the courtroom and could visualize Robert's gait and judge his credibility, was in the best position to decide if Robert would require future medical care. The jury also heard Dr. Buch testify that Robert was currently doing well, had returned to college, and had returned to work. Buch's notes from a March 13, 2012, visit stated, "The patient comes back in and is doing great overall. He has a little soreness here and there, but overall now he is finally doing well." After a March 1, 2013, visit, Buch wrote, "The patient comes back in. His left knee is doing well. He is functional. He has good range of motion. He

has occasional soreness with changes in weather, which is not unusual." Although Buch was concerned that Robert might develop arthritis ten or fifteen years down the road, he also testified, "[I]f he stays like this and does fine[,] . . . he doesn't need any other treatment."

In light of Buch's testimony and medical records, we find that the jury's zero-dollar award for future medical expenses is supported by factually sufficient evidence.

### c.     Physical pain and mental anguish in the past

"'Mental anguish is defined as 'intense pain of body or mind . . . or a high degree of mental suffering.'" *Perez v. Arredondo*, No. 04-13-00646-CV, 2014 WL 6864817, at *9 (Tex. App.—San Antonio Dec. 3, 2014, no pet. h.) (mem. op.) (quoting *Hicks v. Ricardo*, 834 S.W.2d 587, 590 (Tex. App.—Houston [1st Dist.] 1992, no writ). "'Mental anguish is something more than mere worry, anxiety, vexation, or anger.'" *Id*. (quoting *Hicks*, 834 S.W.2d at 590). "Mental suffering may be implied from injuries accompanied by physical pain." *Id*.

Robert testified that he experienced pain due to the injury and during his treatment. However, "uncontroverted, objective evidence of injury does not always require mental anguish damages." *Lanier*, 401 S.W.3d at 455. Robert did not ask for a specific amount for past physical pain and mental anguish at trial and does not argue that a specific sum should have been awarded on appeal.[3] This is because "[m]atters of pain and suffering [and] mental anguish . . . are necessarily speculative, and it is particularly within the jury's province to resolve these matters and determine the amounts attributable thereto." *Id.*

---

[3] During closing argument, Robert admitted that such damage issues "are tough to decide" and agreed to leave the issues "within [the jury's] sound discretion."

We find the evidence factually sufficient to support the jury's award of $2,500.00 for physical pain and mental anguish in the past.

### d. Physical pain and mental anguish in the future

"'Damages for future mental anguish are recoverable only if there is a reasonable probability that they will be suffered in the future.'" *Perez*, 2014 WL 6864817, at *9 (quoting *Hicks*, 834 S.W.2d at 590). "Similarly, damages for future physical pain are recoverable only if there is a reasonable probability the injury will continue to affect the plaintiff into the future." *Id*.

Here, the jury awarded Robert for his past physical pain and mental anguish, but refused to award damages for future pain and mental anguish even though Robert claimed that he was still in pain at trial. The jury clearly felt that Robert's injury had improved and that he was better. *See id.* at *10. Given Buch's testimony that Robert was doing well and only experienced a normal amount of soreness during weather changes and given that the fact-finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony, we cannot conclude that the jury's finding of zero damages with regard to Robert's future pain and mental anguish is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See id.* at *9. Thus, the finding on future physical pain and mental anguish is supported by factually sufficient evidence.

### e. Physical impairment in the past

The "effect of any physical impairment must be substantial and extend beyond pain, suffering, mental anguish, lost wages or diminished earning capacity." *Jackson*, 116 S.W.3d at

15

772. Here, the jury reviewed medical records indicating that Robert had already experienced physical impairment as a result of the condition of his left foot. Nevertheless, the jury determined that Robert had been physically impaired as a result of the accident and awarded $2,500.00 for physical impairment in the past, in addition to an award for lost wages, which is not challenged on appeal.

At trial, Robert did not testify that he believed a certain amount for physical impairment in the past would be appropriate and does not provide any guidance on this issue on appeal. The question of physical impairment is also "necessarily speculative, and . . . within the jury's province to resolve." *Lanier*, 401 S.W.3d at 455. Thus, we find that the jury's award of $2,500.00 for physical impairment in the past is supported by factually sufficient evidence.

### f. Physical impairment in the future

"When there is conflicting evidence about the severity of the injuries . . . , the jury has the discretion to resolve the conflicts, determine which version of the evidence to accept, and refuse to award damages." *Id.* In support of his argument that the jury's finding of zero damages with regard to future physical impairment is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust, Robert points to his own testimony that he is not capable of playing sports or enjoying other strenuous activities, as well as Buch's testimony that he might suffer from arthritis in the future.

By the time of trial, Robert had returned to normal activity, was going to school, and was working. By its verdict as a whole, it appears the jury believed Robert, although injured as a result of the accident, was better at the time of trial. Buch's notes from his last visit indicated

16

that Robert was doing well and had good range of motion in his knee. Thus, we cannot conclude that the jury's finding of zero dollars for future physical impairment is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See Perez*, 2014 WL 6864817, at \*10.

In sum, we overrule all of Robert's remaining points of error challenging the jury's damage awards.

## IV. Conclusion

Because factually sufficient evidence supports the jury's verdict, we affirm the judgment of the trial court.

Ralph K. Burgess
Justice

Date Submitted:     December 29, 2014
Date Decided:       February 12, 2015

17