# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00649-CV

**Prabhakar Gopalan, Appellant**

**v.**

**Andrea Marsh, Appellee**

### FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-18-007340, THE HONORABLE JESSICA MANGRUM, JUDGE PRESIDING

## O P I N I O N

Prabhakar Gopalan challenges the decree in this divorce and suit affecting the parent-child relationship (SAPCR). He contends that the trial court abused its discretion in apportionment of parental possession, rights, and duties in ways that contravene the jury's verdict that he has the right to establish the children's primary residence. He contends that the trial court further abused its discretion by conditioning his traveling internationally with the children upon his posting a $250,000 bond. He also asserts that the trial court erred by granting a judgment notwithstanding the verdict that he had a separate-property interest in the marital residence. He challenges seventy-one findings of fact and fourteen conclusions of law and contends that the attorney's fees award must be remanded along with any erroneous aspect of the decree. We will affirm the judgment.

# PROCEDURAL BACKGROUND

Gopalan and Andrea Marsh married in 2009. They bought a house in early 2010; each party contributed funds to the purchase, though whether the funds were separate property was an issue at trial. The couple had children born in 2010 and 2012. Marsh filed suit for divorce in 2018, and Gopalan countersued for divorce less than two weeks later.

After extensive pretrial proceedings, the trial court held an eight-day jury trial in May 2022 and heard additional evidence and argument on non-jury issues in July 2022.[1] The jury made several findings, including the following relevant to this appeal:

- that Gopalan should have the exclusive right to designate the children's primary residence and that the residence should be in Travis County (though not just within the Austin Independent School District);

- that the parties' Milton Street Residence had a fair market value of $1 million and that its value was 88.25% community property, 5.8% Marsh's separate property, and 5.95% Gopalan's separate property; and

- reasonable attorney's fees for the trial-court representation of each party: $267,411.02 for Marsh and $530,393.69 for Gopalan.

The trial court granted Marsh's motion for judgment notwithstanding the verdict, concluding that "the evidence submitted at trial concerning the alleged separate property interest did not meet the

---

[1] Related to this cause, Gopalan has unsuccessfully sought mandamus relief in this Court and in the Texas Supreme Court. Gopalan requested mandamus relief from the trial court's exclusion of an expert through petition to this Court (*In re Gopalan*, No. 03-21-00209-CV, 2021 WL 2964263 (Tex. App.—Austin July 15, 2021, orig. proceeding) (mem. op.)) and the Texas Supreme Court (*In re Gopalan*, No. 21-0811 (Tex. Oct. 22, 2021) (orig. proceeding)). Gopalan also sought mandamus relief from the trial court's denial of his request for temporary orders pending appeal through petition to this Court (*In re Gopalan*, No. 03-23-00061-CV, 2023 WL 2603389 (Tex. App.—Austin Mar. 23, 2023, orig. proceeding) (mem. op.)) and the Texas Supreme Court (*In re Gopalan*, No. 23-0307 (Tex. Sept. 1, 2023)). Gopalan also sought mandamus relief, asking the Texas Supreme Court to order this Court to rule on his appeal. *In re Gopalan*, No. 24-0575 (Tex. Aug. 30, 2024).

standard for clear and convincing evidence." The trial court denied Gopalan's similar motion regarding Marsh's separate-property interest in the marital residence and awarded Marsh sole ownership of the marital residence.

The trial court made both parties joint managing conservators of the children and, consistent with the jury's verdict, gave Gopalan the exclusive right to designate the children's primary residence within Travis County. The court gave Marsh several exclusive rights, including the following:

- to consent to medical, dental, and surgical treatment involving invasive procedures;

- to consent to psychiatric and psychological treatment of the children; to receive and give receipt for periodic payments for child support and to hold or disburse those funds for the children's benefit;

- to make decisions concerning the children's education, including the right to select the children's schools; and

- to apply for, renew, and maintain possession of the children's passports.

The parties were ordered to give the other parent at least thirty days' written notice of departure for international travel, and Gopalan was required to post a $250,000 bond with the Court before traveling internationally with the children. The trial court ordered Gopalan to pay Marsh child support of $2,300 per month, plus amounts for dental and health insurance, and required Marsh to use the child-support payments to maintain health and dental insurance for each child. The trial court ordered Gopalan to pay 100% of the unreimbursed health-care expenses if Marsh is providing health and dental insurance and Gopalan is paying additional child support for the cost of that insurance.

3

The trial court entered a standard possession order with some modifications. It ordered that, until provisions regarding joint therapy were satisfied, Gopalan would have possession of the children during the school term on Thursdays from 6 p.m. to 8 p.m. and on the first, third, and fifth weekends from Friday at 6 p.m. to Sunday at 6 p.m.; summer weekends fall under the election provisions. With written notice by February 1 of even-numbered years, Gopalan could have possession of the children for a specified thirty days from after the school-year ends until seven days before school starts again (or from July 1 to July 31 if he did not timely specify his days); the court gave Marsh the power to designate Gopalan's thirty days of possession in odd-numbered years with timely notice. The decree does not expressly state what happens during the other weeks of the summer. Upon satisfying the provisions for joint therapy, Gopalan's weekend possession period would extend from Friday school dismissal to Monday school resumption and his Thursday possession period would similarly begin with Thursday school dismissal and end with Friday school resumption.

## ISSUES ON APPEAL

Gopalan raised eight issues in his brief. He contends:

1. The Trial Court violated the Texas Constitution and the Texas Family Code by imposing a possession schedule that contravened the Jury Verdict appointing Appellant as the conservator with the exclusive right to designate the primary residence of the children.

2. The Trial Court abused its discretion in apportioning the rights and duties of conservatorship in a manner that contravened the Jury Verdict appointing Appellant as the conservator with the exclusive right to designate the primary residence of the children.

3. The Trial Court abused its discretion by conditioning Appellant's right to travel outside the country with the children upon Appellant posting a quarter-of-a-million-dollar bond.

4

4. The Trial Court abused its discretion with regard to child support, and the payment of unreimbursed medical and dental expenses of the children.

5. The Trial Court abused its discretion in granting a JNOV overturning the Jury's finding of Appellant's separate property interest in the Milton Residence, and committed reversible error by divesting Appellant of that interest.

6. The mischaracterization of Appellant's separate property interest in the Milton Residence and the award of the entire Residence to Appellee requires that the Trial Court's entire Property Division be reversed.

7. The Trial Court issued several findings of fact and conclusions of law that were not supported by the evidence or the law.

8. If either the parent-child provisions or the property division are remanded, the award of trial and appellate attorney's fees must be remanded as well.

To the extent that Gopalan attempts to raise new issues and grounds for reversal in subsequent reply briefs, they are untimely and waived.[2] *See McKinnon v. Wallin*, No. 03-17-00592-CV, 2018 WL 3849399, at *5 n.11 (Tex. App.—Austin Aug. 14, 2018, pet. denied) (mem. op.) (citing *McAlester Fuel Co. v. Smith Int'l, Inc.*, 257 S.W.3d 732, 737 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)). Rule 38.3 restricts a reply brief to addressing matters raised in the appellee's brief. Tex. R. App. P. 38.3; *see also Calvillo v. Carrington Mortg. Servs.*, 487 S.W.3d 626, 630 n.2 (Tex. App.—El Paso 2015, pet. denied) (parties not allowed to present new issue to court in reply brief).

By cross-appeal, Marsh contends that the evidence is legally insufficient to support the jury's verdict that Gopalan had a separate-property interest even under the standard that

---

[2] In addition to an argument that we should ignore Dr. Stephen Thorne's testimony discussed below, issues raised for the first time in reply and surreply briefs include urging that we reverse the trial court's denial of his motion for judgment notwithstanding the verdict concerning Marsh's separate property interest in their residence and that we consider for unstated purposes what he described as the trial court's manifest hostility to him.

5

Gopalan suggests. She alternatively requests that, if we find error in the court's judgment notwithstanding the verdict, we suggest a remittitur or remand for further proceedings.

## DISCUSSION

Of Gopalan's eight issues, one concerns findings of fact and conclusions of law, four challenge the terms that affect the parent-child relationship, two concern the disposition of separate property, and one concerns the award of attorney's fees.

### I. Gopalan's challenge to findings of facts and conclusions of law was inadequately briefed and is waived.

Gopalan challenges 71 (out of 124) findings of fact as supported by legally or factually insufficient evidence and 14 (out of 27) conclusions of law as violating Texas law. In his initial brief, he listed the findings and conclusions by number and referred us to his Request for Amended and Additional Findings of Fact and Conclusions of Law filed in the trial court; that Request, attached to the initial brief, presents an edited or redlined version of the findings and conclusions but does not refer to the record. In his reply brief, he noted his introductory recitation of the evidence in the initial brief and attached an appendix that listed 58 findings and 5 conclusions in one column and listed record cites in an adjacent column. In his sur-sur-reply brief, Gopalan argues that he supplied enough information to inform Marsh of the basis for his complaint and that the trial court's substantive errors require reversal regardless of the findings and conclusions.

An argument must be supported by both appropriate citations to legal authorities and record references. Tex. R. App. P. 38.1(i). This rule is essential to our justice system because "we would be abandoning our role as judges and become an advocate for that party" if we were to undertake our own search for authorities or evidence that might favor a party's position. *Bolling*

6

*v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 895 (Tex. App.—Dallas 2010, no pet.). In the absence of guidance from Gopalan as to where the evidence can be found or what evidence on a cited page supports the elements of his claim, we are not required to sift through the record in search of such evidence. *See* Tex. R. App. P. 38.1(i) (providing that brief must contain appropriate citations to record); *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 520 (Tex. App.—Fort Worth 2012, no pet.) (finding waiver under Rule 38.1(i) when appellant challenged legal and factual sufficiency of evidence to support findings of fact but provided no argument for those grounds); *Golden v. Milstead Towing & Storage*, No. 09-21-00043-CV, 2022 WL 1412303, at *3 (Tex. App.—Beaumont May 5, 2022, no pet.) (mem. op.) ("A party has an obligation to point out deficiencies in the filed findings of fact or conclusions of law or any complaints regarding [the] same are waived." (citing *Dominguez v. Castaneda*, 163 S.W.3d 318, 328 (Tex. App.—El Paso 2005, pet. denied))); *see Cavin v. Abbott*, 545 S.W.3d 47, 72-73 (Tex. App.—Austin 2017, no pet.) (determining that plaintiffs failed to establish prima facie case of claims where they failed to link facts reflected in record to each essential element of claims and failed to provide analysis or explanation but merely "cited en masse to pages of the record they deem[ed] relevant to some unspecified element"). On this voluminous record, Gopalan's citation to the standards of review do not reveal the alleged defects the listed findings of fact or conclusions of law. Even if we consider the appendix to the reply brief that cites pages to the record, it does not include all of the challenged findings and conclusions and merely points to a page in the record without indicating what evidence supports Gopalan's argument.

Gopalan waived his challenge to the findings and conclusions listed in Issue 7.

## II. Terms that affect the parent-child relationship

Gopalan urges by four issues that the trial court abused its discretion in making its child possession and support awards and that its possession schedule violated both constitutional and statutory provisions concerning jury verdicts.

### A. Standard of review

We review conservatorship and child-support issues for abuses of discretion. *Kazmi v. Kazmi*, 693 S.W.3d 556, 566 (Tex. App.—Austin 2023, pet denied). A trial court abuses its discretion when it rules arbitrarily, unreasonably, without regard for guiding rules or principles, or without supporting evidence. *Id.* (citing *Transcor Astra Group S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 482 (Tex. 2022)).

In this context, the abuse-of-discretion standard overlaps with traditional standards for reviewing the sufficiency of the evidence. *Id*. (citing *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). The legal and factual sufficiency of the evidence are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 795 (Tex. App.—Austin 2023, no pet.). We first determine "whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the trial court erred in its application of discretion." *Id*. The focus of the first inquiry is the sufficiency of the evidence, which we answer using traditional sufficiency standards of review. *Kazmi*, 693 S.W.3d at 566.

In reviewing for legal sufficiency, "we view the evidence in the light most favorable to the verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not." *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 794 (Tex. 2020). A party challenging the legal sufficiency of an adverse finding

on which it did not bear the burden of proof at trial "must demonstrate on appeal that no evidence supports the adverse finding." *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). We will sustain a no-evidence challenge when (1) evidence of a vital fact is absent, (2) rules of law or evidence bar us from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Bos v. Smith*, 556 S.W.3d 293, 299-300 (Tex. 2018).

In reviewing for factual sufficiency, "we examine the entire record and consider and weigh all the evidence, both in support of and contrary to the challenged finding." *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). When a party attacks the factual sufficiency of an adverse finding on which it did not bear the burden of proof, we will set aside the finding "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Republic Petroleum LLC v. Dynamic Offshore Res. NS LLC*, 474 S.W.3d 424, 433 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)).

Under either standard, the trier of fact "is the sole judge of the credibility of witnesses and the weight to be given their testimony." *Altice v. Hernandez*, 668 S.W.3d 399, 410 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). We therefore "may not pass upon the witnesses' credibility or substitute our judgment for that of the fact finder." *4922 Holdings, LLC v. Rivera*, 625 S.W.3d 316, 325 (Tex. App.—Houston [14th Dist.] 2021, pet. denied).

**B.      Reliance on Dr. Stephen Thorne's testimony**

Before addressing individual issues, we will address Gopalan's assertion in his reply brief that "Marsh's reliance on Dr. Thorne's excluded expert reports and out-of-date

9

recommendations should be ignored"—a claim that affects more than one of the SAPCR-related issues. The trial court appointed Thorne as the child-custody evaluator in July 2019. Thorne issued reports in December 2019 and October 2020. He did not update his reports before his May 2022 testimony. He testified that he knew very little, if any, of what had taken place with the parties and their children since October 2020. He said that newer information likely would have caused him to tweak his recommendations and agreed that he could not tell the jury what was in the children's best interest in May 2022 because he did not have current information.

Gopalan did not, however, raise any issue challenging the trial court's admission of Thorne's testimony in his initial brief. As set out above, parties cannot properly raise new issues in reply briefs. *See McAlester*, 257 S.W.3d at 737; *McKinnon*, 2018 WL 3849399, at *5 n.11; *see also* Tex. R. App. P. 38.3; *Calvillo*, 487 S.W.3d at 630 n.2. As discussed above, Gopalan had the burden to raise issues demonstrating that the trial court abused its discretion in making the parent-child-relationship aspects of its decree; that review is affected by the legal and factual sufficiency of the evidence. *Kazmi*, 693 S.W.3d at 566. In his initial brief, Gopalan did not seek to reverse the overruling of an objection to Thorne's testimony or otherwise request that we wholly ignore Thorne's testimony. Instead, Gopalan cited several excerpts from Thorne's testimony as favoring his case to be "primary conservator." Any error in the admission of Thorne's testimony was apparent when Gopalan filed his initial brief and was not revealed by Marsh's citation to it in her brief. Gopalan waived his contention that we should disregard Thorne's testimony. While Gopalan contends that Thorne himself admitted that his opinions were based on old information, questions about the quality of the information relied upon by an expert generally address weight rather than admissibility. *See Onwuteaka v. Gill*, 908 S.W.2d 276, 283 (Tex. App.—Houston [1st Dist.] 1995, no writ).

Gopalan also complains that Marsh improperly relied on Thorne's excluded report. Marsh replies that she cited the report only once to point out where Gopalan cited and misrepresented the reports. We will not rely on evidence outside the record from either party.

### C. SAPCR-related issues

Gopalan raises four issues in which the arguments somewhat overlap. For that reason, we will reserve ruling on the individual issues until we have considered all four. Gopalan asserts that the possession schedule and the apportionment of parental rights and duties contravened the jury verdict and that the possession schedule violates the constitution and family code. He also contends that the trial court abused its discretion by placing conditions on his right to take the children out of the country and with regard to his child-support and medical support obligations.

### 1. The possession schedule does not violate the Texas Constitution or Family Code and does not contravene the jury verdict.

Gopalan contends by Issue 1 that Texas law makes the parent given the exclusive right to designate a child's primary residence the "primary conservator" who is entitled to be the children's primary caregiver. He argues that he should, but does not, have at least half of the possession time, citing *Albrecht v. Albrecht*, 974 S.W.2d 262, 264-65 (Tex. App.—San Antonio 1998, no pet.). He contends that the decree improperly denies him possession on odd-numbered weekends throughout the summer in addition to the school-term weekends in violation of the standard possession order. *See* Tex. Fam. Code § 153.312(a)(1). He also argues that allowing Marsh to designate his period of extended summer possession in odd years is a "drastic" divergence from the standard possession order that would allow him to designate his time of possession. *See id.* § 153.312(b)(2). He contends that the court made these deviations despite the

11

"complete lack of evidence supporting such deviation" required by Texas Family Code § 153.256. He argues that the decree violates the child-possession statutes and infringes on his constitutional right as a parent by improperly negating a constitutionally and statutorily protected jury verdict. *See* Tex. Const. art. I, § 15 ("The right of trial by jury shall remain inviolate."); Tex. Fam. Code § 105.002(c)(1) (court may not contravene jury verdict on issue of which joint managing conservator has exclusive right to designate primary residence of child).

Contrary to Gopalan's assertions, the Family Code does not empower the jury to find—and the jury in this case did not find—that one parent is the "primary conservator," "primary parent," or "primary care-giver" or that one parent shall have "primary custody." Gopalan asserts that as "primary parent" he must have primacy over Marsh in a host of facets of the joint managing conservatorship. But, by clear statutory design, his appointment as the conservator with the right to establish the child's primary residence does not come bundled with a superior or primary right to make a host of other decisions as a joint managing conservator. When interpreting statutes, we must presume that the Legislature chose statutory language with care, included each chosen word for a purpose, and purposefully omitted all other words. *In re D.S.*, 602 S.W.3d 504, 514 (Tex. 2020) (citations omitted). The Family Code provides that parents (and occasionally other persons or entities) can be appointed "sole managing conservators," "joint managing conservators," and "possessory conservators." Tex. Fam. Code §§ 153.005-.006. When joint managing conservators are appointed, the parties can ask that the jury decide "which joint managing conservator has the exclusive right to designate the primary residence of the child." *Id.* § 105.002(c)(1)(D). By contrast, the Family Code expressly prohibits the court from submitting to the jury the following issues: "(A) support under Chapter 154 or Chapter 159; (B) a specific term or condition of possession of or access to the child; or (C) any right or duty of a conservator, other than

12

[designation of the child's primary residence or any geographic restriction on that designation]." *Id.* § 105.002(c)(1)(D)-F), (2). The trial court here did not ask the jury to—and the jury did not— appoint either parent a primary conservator, primary parent, or primary caregiver, or award one parent primary custody. Gopalan's argument that the jury's finding that he has the right to establish the children's primary residence makes him the primary caregiver relies on language not present in the current Family Code or the jury charge in this case.

In *Albrecht*, on which Gopalan relies, the jury was asked "who should be appointed as joint managing conservator of [the child] with primary care?" 974 S.W.2d at 265. The charge in *Albrecht* instructed that the parent granted primary care had the right to establish the primary residence of the child. *Id.* The jury named the father the joint managing conservator with primary care, and the trial court gave each parent possession of the child for alternating periods of six months. *Id.* While concluding that the Family Code did not prohibit awarding equal time of possession, the court of appeals held the trial court's order awarding each parent a term of six months of possession established two primary residences for the child and allowed the mother to establish the primary residence of the child for every other six-month period. *Id.* Under those circumstances, the court of appeals held, the father could not effectively exercise the power awarded to him as joint managing conservator with primary care. *Id.* The Thirteenth Court of Appeals followed *Albrecht*, holding that a trial court abused its discretion by contravening a jury verdict giving a mother the right to establish the child's primary residence anywhere in Texas when it established alternating weeks of possession by the joint managing conservators who lived 240 miles apart. *In re Z.K.S.*, No. 13-19-00011-CV, 2020 WL 103864, at *4 (Tex. App.—Corpus

13

Christi-Edinburg Jan. 9, 2020, no pet.) (mem. op.). Unlike in *Albrecht*, the jury did not find that the mother was to give the child "primary care." *See id.* at *1.[3]

   With due respect to those courts, our understanding of the Family Code is more aligned with the reasoning of the Dallas Court of Appeals that was rejected in the *Z.K.S.* opinion. *See In re W.B.B.*, No. 05-17-00384-CV, 2018 WL 3434588 (Tex. App.—Dallas July 17, 2018, no pet.) (mem. op.). In *W.B.B.*, a SAPCR-order modification case, the jury found that the parties should remain joint managing conservators and that the father should have the exclusive right to designate the child's primary residence within the United States. *Id*. at *1. The trial court gave the father exclusive rights to make educational decisions and to maintain the child's passport and awarded possession to each parent in alternating weeks. *Id.* The father argued that the trial court's refusal to give him significantly more possession time than mother and its award of alternating weeks of possession stripped him of his rights as "primary" parent. *Id*. at *3. The court of appeals affirmed, opining as follows:

> Designating a primary residence is necessary for two reasons: to determine residency for purposes of public school enrollment and as a significant factor in the power of relocation. *Doncer v. Dickerson*, 81 S.W.3d 349, 361 (Tex. App.—El Paso 2002, no pet.). Placing the power for those functions in the hands of a single party was intended to achieve stability in custodial issues. *In re R.C.S.*, 167 S.W.3d 145, 148-49 (Tex. App.—Dallas 2005, pet. denied). It is this power that makes Father "primary" as that shorthand term is used, not the number of days he has possession of W.B.B. Thus, even if the calendar determines that in some years Mother has possession of W.B.B. more days than Father does, he retains the exclusive rights awarded him by the jury and the trial court.

---

[3] Gopalan also cites favorably cases affirming even splits of possession when one parent has been given the right to establish the child's primary residence. *See In re S.H.*, 590 S.W.3d 588, 593 (Tex. App.—El Paso 2019, pet. denied); *In re D.R.S.*, 138 S.W.3d 467, 472-83 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). Such holdings do not mandate that less than an even split is necessarily an abuse of discretion.

*Id.* The court held further, "There is simply no requirement in the Family Code that one joint managing conservator be given more time of possession of a child because of any particular jury finding." *Id*. If the jury's determination of which parent has the right to determine the child's primary residence created a presumption controlling the details of the trial court's decisions on possession and conservatorship, we must assume that the Legislature would have said so. *See D.S.*, 602 S.W.3d at 514 (holding that we assume Legislature carefully chose words it included and excluded). We must implement the Legislature's choice not to automatically bestow a minimum amount of possession along with the right to choose the child's primary residence.

The court's decree in this case implements the letter of the jury's verdict. The court asked the jury, "Which joint managing conservator should have the exclusive right to designate the primary residence of the children?" The jury answered "Prabhakar Gopalan" and restricted the geographic scope of his choices to Travis County, Texas. The court did not ask the jury to appoint the parent with "primary care" responsibilities and it properly did not ask the jury to find how much possession each parent should have. The decree provides that Gopalan, "as a parent joint managing conservator, shall have . . . the exclusive right to designate the primary residence of the children within Travis County, Texas." The trial court adopted the jury's verdict and did not contravene or violate the constitutional sanctity of the jury verdict.

By evaluating and setting the possession schedule itself, the trial court abided by the division of labor decreed by the Legislature. As noted above, the Family Code expressly forbids submission of the terms or conditions of possession to the jury. *Id*. § 105.002(c)(2). The Family Code does not define "primary residence" or require the trial court to accord at least half of the time of possession to the parent given the power to establish the child's primary residence. Instead, the Legislature has provided that "[j]oint managing conservatorship does not require the

15

award of equal or nearly equal periods of physical possession of and access to the child to each of the joint conservators." Tex. Fam. Code § 153.135.  The Legislature has not currently provided a minimum amount of possession that courts must award the parent given the right to establish the child's primary residence.[4]

In the absence of a statute setting a minimum amount of possession to accompany the right to establish the child's primary residence, courts must comport with the overarching directive that "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."  *See id.* § 153.002.  The standard possession order was created to guide the courts in ordering the terms and conditions for the minimum possession for a joint managing conservator.  *Id.* § 153.251(a). The presumption is that the standard possession order provides the reasonable minimum possession of a child for a parent named joint managing conservator and is in the child's best interest.  *Id.* § 153.252.  That presumption is rebuttable.  *Id*.  In ordering a deviation from the standard possession order,

> the court shall be guided by the guidelines established by the standard possession order and may consider:  (1) the age, developmental status, circumstances, needs,

---

[4]  The Legislature previously adopted then repealed a provision that "[t]he standard possession order provided by Subchapter F constitutes a presumptive minimum amount of time for possession of a child by a parent named as a joint managing conservator who is not awarded the primary physical residence of the child in a suit."  Former Tex. Fam. Code § 153.137; Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 150-51,  *amended by* Act of May 27, 2003, 78th Leg., ch. 1036, § 12, 2003 Tex. Gen. Laws 2987, 2991 ("The standard possession order provided by Subchapter F constitutes a presumptive minimum amount of time for possession of a child by a parent named as a joint managing conservator who is not awarded the *exclusive right to designate* the primary [physical] residence of the child in a suit."), *repealed by* Act of May 27, 2009, 81st Leg., ch. 1113, § 31, 2009 Tex. Gen. Laws 3056, 3072.  Though this statute concerned possession by the non-designating parent, it demonstrates the Legislature's ability to address the interaction of designation of primary residence and time of possession and its choice not to do so in the applicable version of the Family Code.

and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factor.

*Id.* § 153.256. Gopalan contends that the trial court abused its discretion by denying him alternate weekend possession during the summer and by allowing Marsh to designate the time of his extended summer possession in odd-numbered years. He contends that there was a complete lack of evidence to support these deviations from the standard possession order.

In Finding of Fact No. 87, the trial court found:

> The summer possession schedule set forth in the Final Decree of Divorce is in the best interest of the children because the parties have difficulty communicating effectively about summer camps and travel. The children historically have participated in summer camps and vacations that require enrollment or reservations as early as February. The children historically have participated in summer camps that require arrival on a weekend. During the separation period PRABHAKAR GOPALAN failed to deliver the parties' older child to a residential summer camp on a weekend day during his period of possession. The daughter's attendance at the camp had been agreed between the parties. PRABHAKAR GOPALAN's actions caused the child to miss the camp.

This finding was not among the 71 findings Gopalan challenged. When a finding of fact is filed and unchallenged it is binding on an appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Mullins v. Mullins*, 202 S.W.3d 869, 876 (Tex. App.—Dallas 2006, pet. denied). Testimony is sufficient to support Finding No. 87. The testimony of Shobie[5] Partos, the mother of a friend of the child, supported the finding. Partos testified that Gopalan did not bring his child to the pre-camp sleepover parents had arranged to acclimate the children to being together and did

---

[5] Reference is made elsewhere in the reporter's record to "Shelby" Partos, but we will use the name as it is spelled in the section of the reporter's record where her testimony is transcribed.

17

not bring the child to the camp.  She testified that Gopalan called her on FaceTime from a vehicle while the other children were at the camp being checked in.  She said that, on the call, she saw Gopalan's child sobbing uncontrollably in the back seat and testified that Gopalan told Partos to say (presumably to the camp registrars) that the child did not want to go to camp.  Partos testified that Gopalan then asked to speak to her child and had a brief conversation using an inappropriate tone that her child found frightening and confusing.  Gopalan then repeated that sequence with a second mother and child until that mother terminated the call.  Partos testified that Gopalan's child did not attend the camp, that the children thereafter saw each other less, and that Gopalan's child became much more introverted.  Marsh testified that she and Gopalan had agreed for a child to attend a sleepaway camp, that Gopalan had the children on Sunday, that the dropoff was Sunday, and he did not honor his agreement.  She testified that her child had been talking about it for months, but that Gopalan said the child did not want to go because it would be too many nights separated from him.  She testified that, when Gopalan talked to the parents and children who were at the camp, he asked the children "Didn't [my child] tell you it was her mom making her go to Girl Scout camp and she didn't want to go?"  Marsh testified that Gopalan then started trying to change all of their extracurricular activities and signing them up for clubs that would meet during her possession hours.

The evidence and the finding support a conclusion that the trial court did not abuse its discretion by departing from the standard possession order for the summer.  *See In re R.H.H.*, No. 04-09-00325-CV, 2010 WL 2842905, at *2, 4-6 (Tex. App.—San Antonio July 21, 2010, no pet.) (mem. op.); *see also Panalez v. Telano*, No. 03-14-00675-CV, 2015 WL 7422972, at *5-6 (Tex. App.—Austin Nov. 19, 2015, no pet.) (mem. op.) (trial court could have determined that non-standard summer possession would meet competing interests and be best for the child).  In *R.H.H.*,

18

the court found that, on his days of possession, the father would not take the children to after-school activities because he did not believe they were actually interested in the activities and in summers would not take them to a neighborhood pool to swim with their club. 2010 WL 2842905, at *4. The parents accused each other of causing communication problems and an inability to work together. *Id*. at *6. The court of appeals held that the trial court was in the best position to judge their credibility and did not abuse its broad discretion to decide what was in the children's best interests when formulating the terms of possession. *Id*.

Similarly, we conclude that the trial court was best positioned to assess the witnesses' testimony and credibility and that it did not abuse its discretion when concluding that the departures from the standard possession order were in the children's best interest. The evidence indicated that Gopalan failed to discuss scheduling changes for the children's activities in general, failed to comply with agreed arrangements for summer activities, and in doing so created problems for at least one child in her relationships with other children. Given the evidence on the need for scheduling summer activities for children and Gopalan's disruption of summer plans, we conclude that the trial court did not abuse its discretion in allotting Marsh greater control in scheduling the children's summer activities—including the timing of Gopalan's extended summer possession. The trial court's establishment of terms of possession and conservatorship is consistent with the Legislature's balance of parental interests and does not violate the Texas Constitution or the Family Code or contravene the jury's verdict.

19

**2. Gopalan has not shown that the apportionment of parental rights and duties is an abuse of discretion impermissibly in conflict with the jury's verdict.**

Gopalan complains by Issue 2 that the trial court also created conflict with the jury's verdict awarding him the exclusive right to determine the children's primary residence by awarding Marsh these exclusive rights:

(i) to consent to medical, dental, and surgical treatment of the children involving invasive procedures;

(ii) to consent to psychiatric and psychological treatment of the children;

(iii) to make decisions concerning the children's education, including the exclusive right to select and enroll the children in school; and

(iv) to apply for, renew, and maintain possession of the children's passports.

He complains that, by doing so, the Trial Court cut him out of making or even participating in making the most significant decisions in raising the children.[6] He argues that such decisions are natural rights between parents and children that are constitutionally protected, essential, and far more precious than property rights, citing *Stanley v. Illinois*, 405 U.S. 645 (1972) and *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). He relies on the Supreme Court's holding that "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel v. Granville*, 530 U.S. 57, 72-73 (2000). Gopalan contends that these decree provisions unconstitutionally deprive him of his parental rights that flow from and are inextricably bundled with being the parent with the exclusive right to establish the children's primary residence.

---

[6] Gopalan also complains about the imposition of a bond for international travel. We will consider that condition under Issue 3, which addresses that term separately.

Gopalan and Marsh both have parental rights that are constitutionally protected, *see Holick*, 685 S.W.2d at 20, and Gopalan's appointment as the parent with the right to designate the children's primary residence does not make his parental rights and duties toward the children any more precious or entitled to constitutional protection than Marsh's rights. A decree granting certain rights exclusively to one fit parent is not unconstitutional. *See Stillwell v. Stillwell*, No. 03-17-00457-CV, 2018 WL 5024022, at *5 (Tex. App.—Austin Oct. 17, 2018, pet. denied) (mem. op.). In enacting the Family Code, the Legislature expressly contemplated a division of rights and duties and did not automatically award them to the parent given the right to establish the child's primary residence. The Legislature provided, "If both parents are appointed as conservators of the child, the court shall specify the rights and duties of a parent that are to be exercised: (1) by each parent independently; (2) by the joint agreement of the parents; and (3) exclusively by one parent." Tex. Fam. Code § 153.071. The Legislature listed several distinct rights and duties of a parent and included a catch-all provision for other rights.[7] *See id.* § 151.001. The Legislature expressly defined "joint managing conservatorship" as "the sharing of the rights and duties of a parent by two parties, ordinarily the parents, *even if the exclusive right to make certain decisions may be awarded to one party*." *Id.* § 101.016 (emphasis added). Although the Legislature could have granted the entire bundle of rights and responsibilities over the children to the parent whom the jury decided could decide the children's primary residence, it clearly did not. We find no basis on which to conclude that the trial court abused its discretion simply by exercising

---

[7] The statute does not expressly address control of a child's passport, but that is within the catch-all provision concerning "any other right or duty existing between a parent and child by law." *See* Tex. Fam. Code § 151.001(a)(11); *see also id.* § 153.501-.503 (establishing passport controls related to risk of international abduction). We will discuss the passport-control issue as part of the review of the international-travel-bond requirement in Issue 3.

21

its legislatively created discretion to accord the exclusive right to make medical, schooling, and passport decisions to a different parent than the jury accorded the right to establish the children's primary residence. Rather, were we to hold that the jury's determination of which parent has the right to establish the child's primary residence necessarily controlled those other rights, we would impermissibly undermine the Legislature's careful delineation of rights to be determined by the trial court from those that the jury can decide. *See id.* § 105.002(c).

Gopalan's substantive argument leans on his contention that the jury appointed him "primary conservator." Consistent with our analysis of Issue 1, we find no abuse of discretion in the trial court awarding the contested exclusive decision-making rights to Marsh when the jury awarded Gopalan the exclusive right to establish the children's primary residence. Of the contested rights, school enrollment is the only one at all tied to residence, and even those rights are somewhat distinct. *See, e.g., In re Cole*, No. 03-14-00458-CV, 2014 WL 3893055, at *2-3 (Tex. App.—Austin Aug. 8, 2014, orig. proceeding) (mem. op.) (conservator's right to designate a child's primary residence is separate from right to make decisions concerning a child's education and enroll child in school). In *Cole*, the court's order that a child be enrolled in School District A did not undercut the parent's right to have chosen a primary residence in School District B because the child was allowed to transfer to School District A. *Id.* The delegation of rights to make other educational decisions, the specified physical and mental health decisions, and international-travel decisions do not impinge on Gopalan's right or ability to decide the children's primary residence.

Sufficient evidence supports the trial court's exercise of discretion on these awards. Custody evaluator Thorne recommended that Marsh be given the right to make educational, medical, and psychological decisions concerning the children, and the record supports that recommendation. The parties had difficulty making decisions together and required court

intervention on educational decisions and choice of therapist for the children; the record supports giving one parent the exclusive rights to make those decisions. Marsh testified that she had been the children's main caretaker for much of their early lives, especially while Gopalan's work required days of travel. Accordingly, she had handled most of their educational and medical needs. Marsh testified that Gopalan would visit schools and knew the status of the children's health but generally was not directly involved in these matters. Gopalan testified that the children were healthy and that he was present at their checkups. He testified that, after the separation, he took the children to 21 of their 24 appointments. In 2019, Gopalan and the children were in a car accident and one child went to a hospital for tests; Gopalan testified that Marsh did not arrive for about an hour after he and the child did, while she testified that she arrived shortly after they did. On the record presented, we cannot say that the trial court abused its discretion by assessing the testimony, resolving conflicts, and making its decree that Marsh should have the right to make the awarded decisions.[8]

### 3. Gopalan has not shown that the bond requirement for international travel with the children is an abuse of discretion.

Gopalan complains by Issue 3 that the trial court's requirement that he post a $250,000 bond in order to travel with the children violates his rights under the Due Process Clause of the United States Constitution. He also contends that the requirement violates the Texas Constitution's guarantee that equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. *See* Tex. Const. art. 1, § 3a. Gopalan decries as highly insensitive the trial court's findings that "credible evidence has been presented that there is a

---

[8] The award of control over the children's passports is consistent with safeguarding against the risk of international abduction discussed below in Issue 3.

23

potential risk of the international abduction" of the children and that he "has strong familial, emotional, or cultural ties to another country, India, which is not a signatory to or compliant with the Hague Convention on the Civil Aspects of International Child Abduction." Although Gopalan was born in India, it is undisputed that he has lived in the United States for twenty-four years (since he was twenty-two years old) and gave up his Indian citizenship to become a United States citizen in 2016. He contends that the implication that his country of origin would make it more likely that he would abduct the children to India evokes unwarranted and inappropriate cultural or racial stereotypes. He further contends that Marsh's evidence on international abduction was conclusory and without probative value.

Gopalan also contends that he lacks the ability to post the "exorbitant" and "onerous" bond, which he contends functionally prohibits his international travel with the children to any country. He contends that this functional ban violates his right to travel internationally and deprives him of it without due process. *See* U.S. Const. Amends. V, XIV; *see also Kent v. Dulles*, 357 U.S. 116, 125-27 (1958) (discussing liberty interest in travel); *Lynd v. Rusk*, 389 F.2d 940, 945 (D.C. Cir. 1967) (same). He also decries the decree's provision that his "violation of this international abduction order may subject Prabhakar Gopalan to a civil or a criminal penalty or to both civil and criminal penalties;" he asserts there is no such thing as an "international abduction order" in the Family Code and that "[t]his denigrating and discriminatory language is an abuse of discretion" that must be reversed.

Gopalan ascribes improper discriminatory motive to a process that is based on evidence assessed against neutral and objective criteria. *See* Tex. Fam. Code §§ 153.501-.503. The court must first determine if credible evidence has been presented to the court indicating a potential risk of the international abduction of a child by a parent of the child. *Id.* § 153.501(a).

24

If so, the court must determine whether it must take one or more statutorily prescribed steps to protect the child from the risk of abduction by the parent. *Id.* The court must consider:

> (1) the public policies of this state described by Section 153.001(a) and the consideration of the best interest of the child under Section 153.002;
>
> (2) the risk of international abduction of the child by a parent of the child based on the court's evaluation of the risk factors described by Section 153.502;
>
> (3) any obstacles to locating, recovering, and returning the child if the child is abducted to a foreign country; and
>
> (4) the potential physical or psychological harm to the child if the child is abducted to a foreign country.

*Id.* § 153.501(b). The abduction risk factors include whether the parent:

> (2) has previously threatened to take, entice away, keep, withhold, or conceal a child in violation of another person's right of possession of or access to the child;
>
> (3) lacks financial reason to stay in the United States, including evidence that the parent is financially independent, is able to work outside of the United States, or is unemployed; . . . .

*Id.* § 153.502(a) (including six risk factors). A trial court need find the existence of credible evidence to support a finding that only one of the factors exists before considering the additional factors in subsection 502(b). *See Gerges v. Gerges*, 601 S.W.3d 46, 58 (Tex. App.—El Paso 2020, no pet.); *Chen v. Hernandez*, No. 03-11-00222-CV, 2012 WL 3793294, at *10-11 (Tex. App.—Austin Aug. 28, 2012, pet. denied) (mem. op.). The court shall then consider evidence of the risk of international abduction, including:

> (1) whether the parent has strong familial, emotional, or cultural ties to another country, particularly a country that is not a signatory to or compliant with the Hague Convention on the Civil Aspects of International Child Abduction; and

(2) whether the parent lacks strong ties to the United States, regardless of whether the parent is a citizen or permanent resident of the United States.

Tex. Fam. Code § 153.502(b); *Chen*, 2012 WL 3793294, at *11. The court may also consider whether the foreign country to which the parent has ties:

(A) presents obstacles to the recovery and return of a child who is abducted to the country from the United States;

(B) has any legal mechanisms for immediately and effectively enforcing an order regarding the possession of or access to the child issued by this state;

. . .

(H) is a party to and compliant with the Hague Convention on the Civil Aspects of International Child Abduction according to the most recent report on compliance issued by the United States Department of State . . . .

*Id.* § 153.502(c)(4); *Chen*, 2012 WL 3793294, at *11. If the court finds that it needs to take measures to protect a child from international abduction by a parent of the child, the court may "order the parent to execute a bond or deposit security in an amount sufficient to offset the cost of recovering the child if the child is abducted by the parent to a foreign country." Tex. Fam. Code § 153.503(6).

Marsh testified and the court found that Gopalan had threatened to take the children away without Marsh's consent and that he lacks financial reason to stay in the United States because he can work remotely. Marsh testified that, a few days after the elder child was born, Gopalan threatened to take the child to his parents in India because they knew how to care for children, unlike Marsh; she said she thought he was just venting but she took pictures of the child with her own camera in case he was serious. A friend testified that, when Marsh told her about that incident, Marsh said she "took that not as just an empty threat. She was very concerned about

26

that." Marsh said he later threatened to take both children away to San Francisco. This evidence is sufficient to support a finding that Gopalan threatened to take away the children and to support the court's considering other factors concerning the risk of international abduction.

Though a long-term resident and now a naturalized citizen of the United States, Gopalan testified that he was born and obtained a civil-engineering degree in India and that his father and sister live in India. He also testified that he wanted to make a long-awaited trip to India with the children to visit their living ancestors, including his father who was not healthy at the time of trial. Gopalan testified that he hoped to negotiate a time for that visit. While the negotiations are not a sign of abduction risk, the testimony supports the finding that Gopalan has strong familial, emotional, or cultural ties to another country. Attorney Poorvi Chothani testified regarding the state of Indian law and its potential uses by Gopalan, though she did not testify to knowing any plans or intent by Gopalan. She said she is admitted into the bars of New York and India and has practiced family and immigration law during her more than 30-year career. Chothani testified that India is not party to the Hague Convention. She testified that, as a person of Indian descent, Gopalan could reside and work in India indefinitely by registering as an Overseas Citizen of India, as could the children; they could also attend school in India. She further testified that other visa options permitting a long-term stay existed. Chothani also testified that Indian courts would make their own assessment of the best interest of the children without regard to the Texas court's decision. She said that a custody decision from Indian courts could take several years because of severe court backlogs, multiple opportunities to file motions and interlocutory relief, and layers of appeal that could include remands to the trial court.

Gopalan asserts that the evidence of the prospects of international abduction was woefully insufficient, bald speculation, and culturally and ethnically biased, but the trial court was

27

positioned to assess whether Gopalan's threats of abduction and ties to another country showed a risk of international abduction. Without showing bias on impermissible grounds, the evidence supports the trial court's findings that India is not a signatory to the Hague Convention, that the backlog in Indian courts presents obstacles to the recovery and return of a child who is abducted to India from the United States, and that India lacks legal mechanisms to immediately and effectively enforce an order regarding the possession of or access to the child issued by this state. Though, as Gopalan points out, the bond requirement affects travel to all countries, his connections to India and its legal challenges make abduction there a possibility if the children leaving the country with him. The evidence that supports the international-travel bond also supports the court granting Marsh control over the children's passports.

Based on the evidence of the risk of international abduction, the court opted to require Gopalan to post a $250,000 bond before traveling internationally, an amount supported by the evidence in this case. *See* Tex. Fam. Code § 153.503(6) (providing court may "order the parent to execute a bond or deposit security in an amount sufficient to offset the cost of recovering the child if the child is abducted by the parent to a foreign country."). The court had before it Chothani's testimony about the potentially lengthy legal process to recover a child in India as well as the example of this existing lawsuit—a nearly four-year period between petition and final decree, including a multi-day trial. The $250,000 bond is less than the $1.12 million Gopalan claimed he had incurred in attorney's fees litigating this cause at the time of trial (of which the jury found $530,393.69 were reasonable fees) and the $267,411.02 Marsh claimed she had incurred in attorney's fees (all of which the jury found were reasonable fees). Regarding Gopalan's ability to fund the bond, the evidence included a 2022 loan application in which Gopalan claimed an annual income exceeding $500,000. The El Paso Court of Appeals found no abuse of discretion in a

28

$400,000 bond intended to protect against the risk of international abduction by a mother who earned $600,000 annually. *Martinez Jardon v. Pfister*, 593 S.W.3d 810, 830 (Tex. App.—El Paso 2019, no pet.). That court held that the mother had "considerable resources to assist her in hiding the child and engaging in legal maneuvers to avoid returning him." *Id*. We cannot say that the trial court here abused its discretion by ordering Gopalan to post a $250,000 bond before traveling internationally with the children. *See Gerges*, 601 S.W. 3d at 46, 58-59 (reviewing decision to impose international-abduction measures for abuse of discretion).

The order also survives Gopalan's constitutional arguments. He contends that the trial court's restrictions violate his right to travel with his children internationally without due process or due course of law. *See* U.S. Const. Amend XIV, § 1; Tex. Const. art. I, § 19. He contends that the restrictions improperly discriminate against him based on race, color, or national origin as prohibited by Title VII of the Civil Rights Act of 1964 and Texas Constitution, article I, section 3a. He argues that strict scrutiny requires that a state action restricting fundamental constitutional rights be narrowly tailored to further a compelling governmental interest. *Johnson v. California*, 543 U.S. 499, 506 (2005). The safety of children and the protection of parental bonds is a compelling governmental interest served by the bond requirement. The bond requirement does not prohibit Gopalan from traveling with the children; it requires a deposit to protect against the risk of abduction shown by evidence at an adversarial hearing in which Gopalan participated. It is narrowly tailored to protect the interest of Marsh in having the resources to recover the children in the event Gopalan took them to another country where she did not have quick legal recourse to assert her rights. Further, the restrictions on international travel *with the children* do not impinge on *Gopalan's* right to travel. *Cf. In re C.R.O.*, 96 S.W.3d 442, 452 (Tex. App.—Amarillo 2002, pet. denied) (children's domicile restriction did not violate mother's

29

constitutional right to travel). Nor does the bond requirement prohibit the children from traveling. Gopalan and the children are free to leave the United States consistent with the United Nations declaration and covenant he cites,[9] but as discussed above evidence supports conditioning his right to take his children based on posting the bond that evidence showed was commensurate with the risk of abduction, the potential expense to Marsh of recovering them and enforcing the decree, and Gopalan's income.

The bond requirement does not discriminate against Gopalan based on his race, color, or national origin. The record indicates that the requirement was imposed, not because Gopalan is from India, but because of the evidence that he had threatened to take the child to India, that he had emotional and family connections to India, and had the ability to stay and support himself there; said another way, there is no evidence that the bond requirement was based on Gopalan's demographic characteristics instead of, as found, the interaction of his behavior, his connections, and potentially relevant legal conditions in India. The due-course-of-law and due-process provisions of the Texas and United States constitutions do not prohibit courts from circumscribing all constitutional rights, but require that a party be afforded due process or due course of law before freedoms are constrained. U.S. Const. Amend XIV, § 1 ("nor shall any State deprive any person of life, liberty, or property, *without due process of law*") (emphasis added); Tex. Const. art. I, § 19 ("[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, *except by the due course of the law of the land*.") (emphasis added). The Legislature created a process in the Family Code Sections

_____

[9] Gopalan cites the following: United Nations, *Universal Declaration of Human Rights*, art. 13 (1948) and United Nations (General Assembly), *International Covenant on Civil and Political Rights*, art. 12 (1966). He contends that these are the supreme law of the land under Article VI of the United States Constitution.

30

153.501-.503 to assess and protect against the risk of international abduction, the trial court implemented that process, and Gopalan had the opportunity to and did participate in the hearing. We conclude that Gopalan has not shown he was deprived of any rights without due process and that the deprivations did not violate equal-protection provisions or his or the children's right to travel.

Gopalan's objection to the use of the phrase "international abduction order" in the divorce decree does not show an abuse of discretion. He contends that the Family Code does not provide for an "international abduction order" and that the language is denigrating and discriminatory. But the Family Code allows the trial court to "**order** passport and travel controls" to "protect a child from **international abduction**." *See* Tex. Fam. Code § 153.503. We conclude that the trial court did not abuse its discretion by combining this statutory language as it did. Having found no abuse of discretion and no impermissible discrimination in the trial court's imposition of the bond requirement, we reject his contention that the language is denigrating and discriminatory.

### 4. Gopalan has not shown that the requirement he pay child support and the children's unreimbursed health expenses is an abuse of discretion.

Gopalan contends in Issue 4 that the trial court abused its discretion by ordering him to pay child support and the children's unreimbursed health expenses based on his contention that "it is exceedingly rare that a court would require the primary conservator to pay child support to the secondary conservator." He contends that, when reversing the possession schedule, we should also reverse and remand the determination of child support to comport with the new periods of possession. As we are not reversing the possession schedule, this argument fails. Further, the

31

trial court did not abuse its discretion by requiring Gopalan to pay child support based on the parties' resources and the best interest of the children.[10]

The trial court's paramount guiding principle in making child-support decisions is the child's best interest. *Iliff v. Iliff*, 339 S.W. 3d 74, 81 (Tex. 2011). Parents have a duty to support their minor children. Tex. Fam. Code § 151.001(a)(3). "The appointment of joint managing conservators does not impair or limit the authority of the court to order a joint managing conservator to pay child support to another joint managing conservator." *Id.* § 153.138. The court has the discretion to order either or both parents to pay child support so long as the amount is equitable considering the circumstances of the parents. *Id*. §§ 154.001, .018, .123(b)(17). The court shall order medical support and dental support for the child. *Id.* § 154.008.

Which parent determines the children's primary residence and who has the greater amount of possession of the children does not control which parent pays child support. The Fort Worth Court of Appeals concluded that a trial court did not abuse its discretion by requiring the mother—who had the right to designate children's primary residence and with whom the children lived most of the time—to pay child support to the father. *S.L. v. S.L.*, No. 02-19-00017-CV, 2020 WL 4360448, at *3-5 (Tex. App.—Fort Worth, July 30, 2020, no pet.) (mem. op.). That trial court heard evidence that mother had always earned significantly more than father during the marriage, that father's annual gross income was less than 25% of mother's average gross income

---

[10] Gopalan does not make an independent argument regarding his obligation to pay unreimbursed medical and dental expenses of the children. It is unquestioned that the children's best interest is served by having such expenses paid. Because Gopalan makes no unique arguments regarding those expenses, we will consider the imposition of that obligation on Gopalan based on the same considerations on which we review the child-support obligation.

for the three years before the trial, and that father's monthly expenses were higher than his monthly income. *Id*. at *4.

Similarly, in this case, evidence showed that Gopalan's monthly net resources greatly exceeded Marsh's resources. Gopalan declared an annual income of $512,500 in a February 2022 credit application for a monthly average of $42,708.33. Evidence showed that Marsh's monthly net resources were $8,026.23 and that the total money she needed per month was $12,008, of which $1,850 was devoted to child care, school tuition and supplies, and lessons, exclusive of other child-related expenses. A child-support award set in accordance with the Family Code's guidelines is presumed to be reasonable and in the child's best interest. Tex. Fam. Code § 154.122. In a case involving two children, the guidelines set an amount of 25% of an obligor's net monthly resources, capped when the obligor's resources exceed $12,322.99 in gross monthly income at the first $9,200 of the obligor's income. *Id*. §§ 154.125, .126. Based on Gopalan's resources, the guidelines set a child-support obligation at $2,300—the amount ordered by the trial court. The court found the children's best interests served by having an adequate amount of resources in each home to support the children and that the support order was necessary to achieve that goal. This evidence also supports the allocation of responsibility for the children's unpaid medical expenses to Gopalan. Based on the record, we conclude that the trial court did not abuse its discretion by making the child-support order it did.

We overrule Issues 1, 2, 3, and 4.

## III.    Gopalan's separate interest in the Milton Residence

Gopalan asserts by Issue 5 that the trial court abused its discretion by granting a judgment notwithstanding the jury's verdict finding that Gopalan had a separate-property interest

33

in the Milton Residence and committed reversible error by divesting him of that interest. He contends by Issue 6 that the mischaracterization of his separate property and its award to Marsh requires remand of the entire property division portion of the decree.[11]

### A. Burden of proof when proving property presumed to be community is instead separate property

Characterization of marital property as separate or community "is determined by the time and circumstances of its acquisition." *Rivera v. Hernandez*, 441 S.W.3d 413, 420 (Tex. App.—El Paso 2014, pet. denied) (citing *Leighton v. Leighton*, 921 S.W.2d 365, 367 (Tex. App.— Houston [1st Dist.] 1996, no writ)). "Property possessed by either spouse during or on dissolution of marriage is presumed to be community property." Tex. Fam. Code § 3.003(a). "Community property consists of the property, other than separate property, acquired by either spouse during marriage." *Id*. § 3.002. Property owned or claimed by the spouse before marriage" or "[p]roperty acquired by the spouse during marriage by gift, devise or descent" is separate property. *Id*. § 3.001. We resolve any doubt as to the character of property in favor of community status. *Eichhorn v. Eichhorn*, No. 03-20-00382-CV, 2022 WL 1591709, at *4 (Tex. App.—Austin May 20, 2022, no pet.) (mem. op.); *Goyal v. Hora*, No. 03-19-00868-CV, 2021 WL 2149628, at *6 (Tex. App.— Austin May 27, 2021, no pet.) (mem. op.) (both citing *Sink v. Sink*, 364 S.W.3d 340, 345 (Tex. App.—Dallas 2012, no pet.)).

---

[11] In his reply briefs, Gopalan contends that the trial court's finding that Marsh had a separate-property interest in the property is also unsupported by documentary evidence. Gopalan conceded in testimony at trial that Marsh used separate property to pay for the house and did not raise this issue in his initial brief. Accordingly, it is not a basis for reversal. *McKinnon v. Wallin*, No. 03-17-00592-CV, 2018 WL 3849399, at *5 n.11 (Tex. App.—Austin Aug. 14, 2018, pet. denied) (mem. op.) (citing *McAlester Fuel Co. v. Smith Int'l, Inc.*, 257 S.W.3d 732, 737 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)).

"Parties claiming certain property as their separate property have the burden of rebutting the presumption of community property." *Goyal*, 2021 WL 2149628, at *5 (quoting *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011)). "Meeting this burden requires tracing and clearly identifying the property in question as separate by clear and convincing evidence." *Id.*; *see* Tex. Fam. Code § 3.003(b) ("The degree of proof necessary to establish that property is separate property is clear and convincing evidence."). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 354 (Tex. App.—Austin 2002, pet. denied); *see also Goyal*, 2021 WL 2149628, at *5 (describing "higher standards of review" for legal and factual sufficiency when burden of proof is clear and convincing evidence).

"A party's own testimony is sufficient to rebut the community property presumption if it is uncontroverted." *Bean v. Bean*, 658 S.W.3d 401, 417 (Tex. App.—Dallas 2022, pet. denied). The Dallas Court of Appeals opined as follows:

> We know of no authority holding that a witness is incompetent to testify concerning the source of funds in a bank account without producing bank records of the deposits. Any doubt cast on the credibility of Pat's testimony by his failure to produce the records or by his subsequent designation of the account as community in his inventory must be considered resolved by the jury, which might also have considered that his testimony was not disputed by Robbie, who actually made the deposits. Accepting Pat's testimony as true, as we must in the light of the verdict, we are unable to say that it was not clear and definite enough to identify the source of the funds on deposit and to exclude any commingling with community funds at the time of the Humble stock was acquired.

*Holloway v. Holloway*, 671 S.W.2d 51, 56 (Tex. App.—Dallas 1983, writ dism'd).

But testimony that property was purchased with separate-property funds, without any tracing of the funds from their inception to the relevant purchase, is on its own insufficient to rebut the community-property presumption. *See McKinley v. McKinley*, 496 S.W.2d 540, 543-44 (Tex. 1973); *Eichhorn*, 2022 WL 1591709, at \*3; *Goyal*, 2021 WL 2149628, at \*6 (quoting *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex. App.—Houston [1st Dist.] 1995, writ denied)). In *McKinley*, the court held that an account sheet from a savings certificate showing $16,000 in the account was inconclusive as to the nature of the funds deposited or withdrawn; in the absence of any attempt to trace the funds, it was impossible to conclude anything about the property's status without resorting to surmise and speculation. 496 S.W.2d at 543-44. Declining to resort to surmise, the Texas Supreme Court held that the party claiming the funds as separate property failed to carry his burden to overcome the statutory presumption of community property. *Id*.

"Where an asset is purchased during marriage with monies traceable to a spouse's separate estate, the asset may appropriately be characterized as separate property." *Rivera*, 441 S.W.3d at 419-20 (citing *Pace v. Pace*, 160 S.W.3d 706, 711 (Tex. App.—Dallas 2005, pet. denied)); *see Bean*, 658 S.W.3d at 416 (describing "burden of tracing" to establish separate property). "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Ganesan*, 96 S.W.3d at 354. Even when there is testimony that property possessed at the time the marriage is dissolved was separate property, the clear-and-convincing-evidence standard requires documentary evidence tracing the separate nature of the property. *Eichhorn*, 2022 WL 1591709, at \*3 (citing *Barras v. Barras*, 396 S.W.3d 154, 164 (Tex. App.—Houston [14th Dist.] 2013, pet. denied)).

36

When a spouse fails to rebut the Family Code's community-property presumption and the property is characterized as community property, it "is not a divestiture of separate property, but a necessary classification of property as set by the community presumption." *See Pearson*, 332 S.W.3d at 364. When separate and community property have been commingled so that they cannot be resegregated and identified, the community-property presumption prevails. *Eichhorn*, 2022 WL 1591709, at *4 (citing *McKinley*, 496 S.W.2d at 543); *see also Goyal*, 2021 WL 2149628, at *6 ("concluding that husband had failed to overcome community-property presumption as to certain retirement and brokerage accounts because neither his testimony nor his exhibits provided 'statements of accounts, dates of transfers, amounts transferred in or out, sources of funds, or any semblance of asset tracing'" (citing and quoting *Ganesan*, 96 S.W.3d at 354)). "Gaps in account statements can make tracing evidence less than 'clear and convincing.'" *Eichhorn*, 2022 WL 1591709, at *4 (citing *In re Marriage of Everse*, 440 S.W.3d 749, 752 (Tex. App.—Amarillo 2013, no pet.)).

### B. The trial court did not err in rendering a judgment notwithstanding the verdict on Gopalan's separate interest.

The jury determined that Gopalan had a 5.95% separate property interest in the Milton Residence, but the trial court granted a judgment notwithstanding the verdict "on the grounds that the evidence submitted at trial concerning [Gopalan's] alleged separate property interest did not meet the standard for clear and convincing evidence." Gopalan contends that this statement shows that the trial court applied an incorrect standard. He contends that the record contains more than a scintilla of evidence that he contributed separate property toward the purchase of the marital home and that the jury—not the trial court—properly characterized his interest.

The trial court's statement on the grounds for its reversal encompasses the proper standard for granting a JNOV—if there is no evidence to support the jury's verdict, it plainly does not meet the standard for clear-and-convincing evidence. We will review the record to determine whether the judgment notwithstanding the verdict was proper based on the proper standard.

### 1. Standard of review

We review a trial court's grant of a judgment notwithstanding the verdict under a no-evidence standard, examining whether any evidence supports the jury's findings.[12] *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015); *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex. 1990). "When reviewing the legal sufficiency of the evidence under this higher standard [of clear-and-convincing evidence], we consider the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true." *Eichhorn*, 2022 WL 1591709, at *2 (citing *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002)); *see also Perez v. Arredondo*, 452 S.W.3d 847, 853 (Tex. App.—San Antonio 2014, no pet.). We must assume that the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could have done so. *Eichhorn*, 2022 WL 1591709, at *2 (citing *J.F.C.*, 96 S.W.3d at 266).

No evidence exists when there is

> (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

---

[12] Though we have held that, "[w]hen a party challenges the characterization of property or division of property in a divorce decree, we review those challenges for an abuse of discretion," *Eichhorn v. Eichhorn*, No. 03-20-00382-CV, 2022 WL 1591709, at *2 (Tex. App.—Austin May 20, 2022, no pet.) (mem. op.), that case was a bench trial. Here, the standard of review differs because we are reviewing the trial court's judgment notwithstanding the jury's verdict.

*City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L.Rev. 361, 362-63 (1960).. More than a scintilla of evidence exists when the evidence supporting the finding "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995) (citation omitted). When determining whether any evidence supports a judgment, we are "limited to reviewing only the evidence tending to support the jury's verdict and must disregard all evidence to the contrary." *Gharda*, 464 S.W.3d at 347 (quoting *Mancorp, Inc.*, 802 S.W.2d at 227). If more than a scintilla of evidence supports the jury's finding, then the judgment notwithstanding the verdict should be reversed. *Komet v. Graves*, 40 S.W.3d 596, 603 (Tex. App.—San Antonio 2001, no pet.) (citing *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex. 1989)).

### 2. Gopalan's tracing evidence has a crucial gap.

We will look at three cases for guidance regarding tracing evidence to support findings that assets are separate property. *See Holloway*, 671 S.W.2d at 56; *see also Eichhorn*, 2022 WL 1591709, at *2; *Goyal*, 2021 WL 2149628, at *5.

Gopalan contends that this case fits within the holding in *Holloway*, discussed above, in which the court of appeals reinstated a disregarded jury finding that stock was separate property when purchased using proceeds from a loan secured by separate property. 671 S.W.2d at 56-57. That record included more than mere testimony. It included

> a promissory note and a security agreement from Pat to the bank, each dated May 10, 1979, and signed "Pat S. Holloway, Separate Property." A statement of purpose for the loan on a bank form, also signed, "Pat S. Holloway, Separate Property," recites the purpose of the loan to be "Equity in pipeline venture." This statement refers to the collateral specified in the security agreement and is certified by an officer of the bank on May 10, 1979. An affidavit by Pat Holloway, dated

May 16, 1979, states that all the securities listed as collateral in the security agreement, valued at more than $40,000, are his separate property, having been acquired before his marriage to Robbie, and that the affidavit is made with knowledge that it will be relied on by the bank in making the loan for his separate account to be secured by the securities listed and in order to induce the bank to make a loan to him for which the community estate shall not be liable. Pat testified that he delivered these papers to the bank at the time of the loan transaction. There is also a deposit slip for $10,000 in the "Pat S. Holloway, Separate Property" account, dated May 17, 1979, although no check in this account for the $3000 paid for the Sterling Pipeline Stock was offered in evidence.

*Id.* at 57. The Dallas court concluded that the evidence—which included testimony supported by documentary evidence substantiating the separate-property source of the funds used in the transaction—was sufficient for the jury to conclude that the stock purchased was the husband's separate property because it was purchased with the proceeds of the loan secured solely by his separate property. *Id.*

By contrast, in *Goyal*, this Court affirmed a trial court's characterization of a brokerage account as community property despite a spouse's testimony that the balance in the account was "100% his separate property." 2021 WL 2149628, at *7, *12. The spouse's tracing expert testified that he was unable to identify what stocks were in the account when the couple married that remained in the account at the time of the divorce. *Id.* at *7. There was also a three-month gap in monthly statements in early 2018. *Id.* at *8-9. We noted that "[g]aps in account statements can make tracing evidence less than 'clear and convincing.'" *Id.* at *9 (citing *In re Everse*, 440 S.W.3d 749, 752 (Tex. App.—Amarillo 2013, no pet.). We similarly concluded that the three-month gap rendered the evidence of the separate-property claim less than clear and convincing. *Id.*

In *Eichhorn*, in this Court reversed a trial court's finding that a woman (Sarah) had a $65,000 separate-property interest in a house purchased during her marriage. 2022 WL 1591709,

40

at *7. Sarah testified that she was awarded $65,000 upon being hired by a university in 2007 as assistance to buy a house, but the funds remained unspent for three years after she married in 2008. *Id*. at *4. She testified that she believed that the funds were the source of a large deposit made into her checking account in March 2011 that was then transferred to another account. *Id.* She had records that showed she did not withdraw from the second account until she used funds from that account to purchase a house in 2018. *Id.* However, at the 2020 trial, she did not have documentation of the source of the $65,000 deposited in 2011. *Id.* at *5. Indeed, on further examination, she conceded that she did not have receipts, did not have documentation from the university that she was paid $65,000, and had assumed because of the link in time between her acceptance of money from the university and the deposit of the $65,000 that the university payment was the source of the deposit. *Id*. at *6. She then conceded that she did not know if the deposit came from her husband. *Id.* On that record, we concluded that Sarah did not carry her burden to trace the $65,000 as separate-property funds. *Id*. Noting that we are required to resolve any doubt as to the character of the property in favor of community status, we concluded that there was insufficient evidence to support a firm belief or conviction that the $65,000 was separate property from its inception. *Id.*

In this case, Gopalan testified that he had a premarital 401(k) from IBM for about $90,000 that he withdrew about two weeks before the purchase of the Milton Residence. The following colloquy occurred at trial:

> A.. . . . I withdrew that money two weeks before—or thereabouts—the purchase of the house, and I used—now, Ms. Marsh had transferred that money. I had put my money. And then I took the remaining and put it into a Chase retirement account, and between the two, we paid the down payment. There are 13 windows, I remember—because it was crazy—for a little house, like 1,064 square foot, bought all the blinds, bought appliances. So we together contributed to that money.

41

Q. Do you have any bank statements that show that?

A. Chase only has a seven-year history of bank statements. No matter what I tried, I could not get. But I do have the 401(k) withdrawal. I have the tax statement of that year which shows the exemption—during that year, Obama was the president, and there was a rule—it was a financial year crisis and all that, so they gave—

MR. McFARLAND: Object as nonresponsive.

THE COURT: Sustained.

Q. (By Mr. McFarland) You don't actually have any documentation to back up what you're currently saying. Correct?

A. I do.

MS. BOLLIER: Objection, Your Honor. That mischaracterizes—he's already answered that.

THE COURT: I'll overrule the objection.

A. I do have documentation.

Q. (By Mr. McFarland) All right. This is kind of an important question. You don't have any—you don't have the bank statement that shows where your check was used to pay for the down payment for Milton. Is that true?

A. I don't know. I'll have to look.

Q. And do you—you don't have any retirement statements from before marriage that would show that that money is now here when it purchases Milton?

A. I do have—that money was there in my retirement prior to marriage. I do have two weeks before that I had to come up with that money, so the withdrawal from my 401(k) is also there.

The record includes documentation of his withdrawal of $94,907.56 from his separate property 401(k) made near the time of the 2010 purchase and his 2010 tax return for the year of purchase showing that he took a home-buying exemption for the disbursement from his 401(k).

42

But Gopalan's testimony did not trace the money from the 401(k) plan to the down payment and he did not provide documentary evidence establishing that tracing. He did not testify or document that his separate-property 401(k) funds were not commingled with community funds in a bank account before being used to make the down payment on the house. When separate and community property have been commingled so that they cannot be resegregated and identified, the community-property presumption prevails. *Eichhorn*, 2022 WL 1591709, at *4 (citing *McKinley*, 496 S.W.2d at 543). In light of the absence of documentary proof that only Gopalan's separate property was used to make his portion of the down payment, the statutory community-property presumption prevails. *See Goyal*, 2021 WL 2149628, at *12; s*ee also* Tex. Fam. Code § 3.003(a); *Eichhorn*, 2022 WL 1591709, at *3. Without considering whether Gopalan's testimony was contradicted or reviewing competing evidence, we conclude that the record contains no more than a scintilla of evidence tracing Gopalan's payment for the house to separate funds.

We conclude that the trial court did not err by granting the judgment notwithstanding the verdict. We overrule Issues 5 and 6.

## IV. Attorney's fees

We overrule Issue 8, by which Gopalan contends that we should remand the issue of attorney's fees along with any other issues remanded, because we are not remanding any issues to the trial court.

43

**CONCLUSION**

Finding no reversible error presented, we affirm the trial court's decree.[13]

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Theofanis
  Concurring and Dissenting Opinion by Justice Triana

Affirmed

Filed:   January 23, 2025

---

[13] Gopalan's Motion for Ruling and Marsh's suggestion of remittitur are dismissed as moot.